RALSTON and others, Trustees, etc., *v.* CRITTENDEN, Governor of the State of Missouri.*

*(Circuit Court, W. D. Missouri. February 10, 1882.)*

1. ACT OF THE GENERAL ASSEMBLY OF THE STATE OF MISSOURI TO PROVIDE FOR REDUCING THE INDEBTEDNESS OF THE STATE, APPROVED FEBRUARY 20, 1865, CONSTRUED.

Where a state issued coupon bonds to a railroad company as a loan of credit, upon condition that said company should provide for the payment of the interest and principal of such bonds, and upon condition also that the state should have a first mortgage upon said company's road to secure the payment of said bonds and interest; and where the general assembly of said state subsequently provided by statute that in case said company should thereafter issue coupon bonds of a certain description, and should convey its franchises and property, subject to the lien of said state, to trustees, to secure the payment of such bonds and coupons, and such trustees should pay into the state treasury "a sum of money equal in amount to all indebtedness due or owing by said company to the state, and all liability incurred by the state by reason of having issued her bonds and loaned the same to said company, * * * together with all interest that has and may, at the time when such payment shall be made, have accrued and remained unpaid by said company,"—it should be the duty of the governor of the state, upon the fact of such payment being certified to him as therein provided, to assign to said trustees, for the benefit of the holders of said com-

*Reported by B. F. Rex, Esq., of the St. Louis bar.
See 7 Sup. Ct. Rep. 599.

pany's bonds issued as aforesaid, the lien and mortgages held by the state; and where trustees, to whom said company thereafter conveyed its road, etc., subject to said lien, to secure the payment of bonds issued by it, paid into the state treasury, as a payment of all liability due by said company to the state in consequence of said loan of credit, a sum of money equal in amount to the face value of all outstanding bonds issued by the state to said company, and the interest which would come due thereon on the first of the following July, but failed to obtain an assignment of the state's lien, and only received a receipt on account: *Held*, that said state had a right to enforce its lien against said road in case of failure on said company's part to pay when due the interest coupons maturing on the following January; and that said trustees were not entitled, by the terms of said act of 1865, to an assignment of the lien of said state, unless they paid into the treasury of said state a sum equal in amount to the face value of all outstanding bonds issued by said state, as aforesaid, and all outstanding coupons which were, or had been, attached to said bonds, whether *due* or not, together with all other indebtedness due or owing by said company to said state by reason of the latter having issued its bonds, as aforesaid, or paid interest thereon..

2. SAME—ARTICLE 4, § 50, AND ARTICLE 15, § 1 OF THE SCHEDULE OF THE CONSTITUTION OF THE STATE OF MISSOURI, OF 1875, CONSTRUED.

Said act of 1865 was not repealed by the articles of the constitution of the state of Missouri, approved November 30, 1875, by which it is provided that the general assembly shall have no power to release, alienate, or alter the lien held by the state upon any railroad, but that the same shall be in force in accordance with the original terms upon which it was acquired, and that the provisions of all laws inconsistent with said constitution should cease upon its adoption.

## Motion for an Injunction.

This was a motion *pendente lite* to restrain Thomas T. Crittenden, governor of the state of Missouri, from selling, or advertising for sale, the Hannibal & St. Joseph Railroad. The facts upon which the motion was based are substantially as follows:

On February 22, 1851, an act was passed by the legislature of Missouri providing for the issue of state bonds, in the sum of one and a half million dollars, to the Hannibal & St. Joseph Railroad Company, as a loan of credit to said company. It was provided in that act that the bonds to be issued shall be redeemable after 20 years from date, bearing 6 per cent. interest, payable semi-annually in New York. They were made payable to the order of and delivered to the company, and transferred by the indorsement of the president thereof. On delivery of the bonds the company should file its certificate of acceptance thereof, in the office of the secretary of state, under its corporate seal and the signature of its president.

The following are the remaining material sections of said act:

"Sec. 4. Each certificate of acceptance so executed and filed as aforesaid shall be recorded in the said office of the secretary of state, and shall thereupon become and be, according to all intents and purposes, a mortgage of the road of the company, executing and filing their acceptance as aforesaid, and every part and section thereof, and its appurtenances, to the people of this state, for

securing the payment of the principal and interest of the sums of money for which such bonds shall. from time to time, be issued and accepted as aforesaid."

"Sec. 9. Each of said companies shall make provision for the punctual redemption of the said bonds so issued as aforesaid to them, respectively, and for the punctual payment of the interest which shall accrue thereon, in such manner as to exonerate the treasury of this state from any advances of money for that purpose; and the tolls and income which shall accrue from the use of their said roads, respectively, when the same or any part thereof shall be constructed, after paying the repairs and the necessary expense of operating the same, and conducting the business thereof, shall be and are hereby pledged for.the payment of said interest."

"Sec. 11. In case the said companies, or either of them, to which bonds shall as aforesaid be issued, shall make default in the payment of either interest or principal of the said bonds, or any part thereof, no more bonds shall thereafter be issued to such delinquent company, and it shall be lawful for the Governor to sell their road and its appurtenances, by auction, to the highest bidder, first giving at least six months' notice of the time and place of such sale, by advertisement, to be published once in each week in the paper which shall publish the laws at Jefferson City, and in two public newspapers printed in the city of St. Louis; or to buy in the same at such sale, for the use and benefit of the state, subject to such disposition in respect to such road, or its proceeds, as the legislature may thereafter direct."   Legis. Acts 1850-1. p. 265.

Between July 1, 1854, and July 1, 1857, inclusive, bonds to the amount of one and. a half million dollars, redeemable in 20 years, were issued and received by the company under the provisions of said act.   The coupons were payable January 1st and July 1st of each year.   On December 10, 1855, another loan of credit of one and a half million dollars was made to said company on the same terms and conditions as that of 1857.

Under this act of 1855 bonds were issued to the Hannibal & St. Joseph Railroad Company, to run for 30 years, at 6 per cent. interest, payable January and July 1st, as follows: $500,000, dated November 10, 1856; $1,000,000, dated February 28, 1857.

On February 20, 1865, the Missouri legislature passed an act, the first section of which is as follows:

"Section 1. The Hannibal & St. Joseph Railroad Company is hereby authorized to issue its bonds, signed by the president and countersigned by the secretary of the company, in sums of $1,000 each, with coupons attached, bearing interest, payable semi-annually, at the rate of 6 per cent. per annum, and having not less than 10 years to run, and to the amount of three millions of dollars; the payment of the same, with the accruing interest, to be secured by a mortgage or deed of trust, conveying to three trustees to be named therein, by and with appropriate forms of expression, and for the purpose of securing the payment of said bonds and interest, and for no other purpose, on the road of said company, with all its franchises, rolling stock, and appurtenances; subject, however, to all the liens and liabilities existing in favor of the state by virtue of any law of the state at the time said bonds may be issued and delivered."

The remaining sections, so far as material, are set forth in the opinion of the court.   The bonds issued under the act of 1851 were renewed, with one exception, under an act passed March 21, 1874, and the renewal bonds will

mature as follows: July 1, 1894, $500,000; July 1, 1895, $203,000; January 1, 1896, $165,000; July 1, 1896, $614,000; July 1, 1897, $17,000.

The railroad company did not offer to take advantage of the act of 1865 until April 30, 1881, but on that day it conveyed its property to the complainants, as trustees, to secure an issue of bonds to the amount of $3,000,000, which bonds the complainants charge were sold in the market, and the proceeds thereof delivered to the state treasurer on June 20, 1881, in payment of all liabilities due by the company to the state in consequence of the aforesaid loan of credit.

It is now claimed by complainants that the $90,000 was for the purpose of paying the coupons due by the state on July 1, 1881, and that the $3,000,000 were paid in full discharge of the outstanding bonds and interest thereafter to mature.

The state treasurer accepted the money on June 20, 1881, placing the $3,000,000 in the treasury, and forwarding the $90,000 to New York for the purpose of meeting the coupons maturing 10 days thereafter.

The treasurer executed a receipt in the following words, to-wit:

"Received of R. G. Ralston, Heman Dowd, and Oren Root, Jr., trustees of the Hannibal & St. Joseph Railroad Company, the sum of three millions and ninety thousand dollars, on account of the statutory mortgage now held by the state of Missouri against the said railroad.
"P. E. CHAPPELL, State Treasurer."

But said treasurer refused to receipt for said sum as a payment in full compliance with the act of 1865; and also refused to certify to the governor that the requirements of said act had been fully complied with by said trustees. The railroad company failing to pay the interest coupons maturing January 1, 1882, the governor of the state, the defendant, determined to advertise and sell the road because of such default.

The complainants thereupon made said motion for an injunction, claiming that the requirements of said act of 1865 had been fully complied with by them, and that the respondent had therefore no right to sell said road as he had threatened.

The defendant answered that section 50, art. 4, and section 1, art. 15, of the constitution of the state of Missouri, adopted November 30, 1875, had operated to repeal said act of 1865, and that the supreme court of the state had so decided.

Said sections of the constitution of Missouri are respectively as follows:

"The general assembly shall have no power to release or alienate the lien held by the state upon any railroad, or in anywise change the tenor or meaning, or pass any act explanatory thereof, but the same shall be in force in accordance with the original terms upon which it was acquired."

"The provisions of all laws which are inconsistent with this constitution shall cease upon its adoption, except that all laws which are inconsistent with such provisions of this constitution as required legislation to enforce them, shall remain in force until the first day of July, 1877, unless sooner amended or repealed by the general assembly."

v.10,no.2—17

The opinion of the supreme court referred to was rendered in the case of the *State of Missouri ex rel.* v. *Chappell, State Treasurer,* which was instituted at the relation of the complainants herein, at the October term, 1881, of said court, asking said court to compel the state treasurer by *mandamus* to execute his certificate in conformity to said act of 1865.

It appears that the supreme court of Missouri refused to grant the *mandamus,* on the ground that said act of 1865 was repealed, as contended, by the constitution of 1875; but it also appears that the question of the *validity* of said act was not raised in said case, either by the pleading or the argument of counsel, and that the only question submitted to the court was as to whether or not the conditions of the act had been fully complied with.

The defendant further contended that the terms of said act of 1865 had not been complied with.

*Geo. W. Easley,* for complainants.

*John T. Dillon, Elihu Root,* and *Wagner Swayne,* of counsel.

*D. H. McIntyre,* Atty. Gen., for defendant.

*Glover & Shepley* and *Henderson & Shields,* of counsel.

In answer to an inquiry at the close of the argument by Mr. Glover, as to when the motion would be decided, MILLER, Justice, said:

We will decide it now, because all three of us are agreed upon so much as is necessary to enable us to make an order refusing this application for an injunction. When that is done, the case remains, anyhow, as it is not here for final decision, and what may come of it hereafter will be seen. The reason why I say we are all agreed that the application for this injunction cannot be sustained is that we do not agree with the complainants' construction of the act of 1865. Looking at the language of the second and third sections of that act, which contain the operative words of the statute, and looking at it with a view to the nicest criticism upon the words themselves, before referring back to the prior legislation and to the general circumstances, we are of opinion that it does not justify the claim of the complainants. The part of the second section which it is necessary to consider reads thus: "Whenever the trustees provided for in the first section of this act shall pay into the treasury of the state a sum of money equal in amount to all indebtedness due or owing by said company to the state, and all liabilities incurred by the state by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the state, together with all interest that has, and may at the time when such payment shall be made have, accrued and remain unpaid by said company, and such fact shall have been

certified to the governor of the state by the treasurer," the governor shall assign this statutory lien.

The object of this bill is to procure an assignment of the statutory lien, because the complainants say they have complied with the requirements that I have just read. It is their contention that when they paid the $3,000,000, which was the principal of all the bonds that the state was liable for on account of the Hannibal & St. Joseph Railroad, and had paid the instalment of interest then just due and accrued, they had complied with this statute. Whatever opinion they may entertain now, that is certainly all they have done, and all they claim to have done. They do not claim that they have done anything more to relieve, remove, or discharge any other liability that the state may be under on account of those bonds.

Now, looking at the language of the statute critically, let us see if there are any other liabilities of the state on account of those bonds which these complainants ought to have extinguished or provided for before they could make this demand. The statute seems to have been drawn with a great deal of care; it seems to have been drawn by a man who evidently knew how to use words, for he uses them well; and applying the well-known rule, that every word in a statute, and especially in the important part of it, like this, ought to have a meaning, and a distinct meaning, if there is a place for it, we come to this: What is it they are to do? They are to "pay into the treasury of the state a sum of money equal in amount to all the indebtedness due or owing" to the state. There has been no comment here on those two phrases. It is obvious they have a different meaning. A man may owe $10,000,000 and not a dollar of it may be due. It may be 10 years before a dollar of it is due, or before a cent of interest is due upon it, because if the interest falls due at odd times it is only by an express provision and not an implied one; therefore the drawer of this bill said: "All indebtedness due," that has to be paid; "all indebtedness owing," that has to be paid; and then "all liabilities incurred by the state by reason of having issued her bonds." It is my opinion that the interest was owing as much as the principal. I do not know but what that would have been the case if it had merely read, like an ordinary bond, that the state agreed to pay the bond and interest at the rate of 6 per cent., payable annnally. I do not know but what all of the interest up to the end of the time the bonds ran would be held to be owing in that case. But, whether that be so or not, I am very sure that when the bond issued has a separate

obligation for each one of these instalments of interest,—a kind of obligation which our court has held, and which all courts now hold, is capable of a distinct suit, and is so far a separate obligation,—that the statute of limitations applicable to the bond is not applicable to the coupon, but begins to run against the coupon, according to its nature, from the time it falls due, and not against the bond. I say that when the governor of the state of Missouri had out so many of these pieces of paper, they were each an item of debt owing at the time this transaction occurred. They need not resort to the word "liabilities;" but, perhaps, to make that which might have been clear a little clearer, and to prevent any mistake whatever, they use a word that covers everything. Whatever the state had become liable for under her issue of those bonds was to be paid by a sum of money equal to it, if paid in money, before the right to the assignment of the statutory lien accrued; and this has not been done.

This view of the matter receives illustration from another clause. By the third section of the act of 1865, the complainants can entitle themselves to receive this assignment without paying a dollar in money to the governor or into the state treasury. That was an obligation which had its condition, and it throws light upon what the other was, when a sum of money equal to so and so was to be paid. And what is that obligation? "The treasurer of the state is hereby authorized and directed to receive of the trustees aforesaid, in payment of the $3,000,000 and interest"—that has to be paid—"as provided in the second section of this act;" that is as much as to say: "By section 2 of this act we did provide that for the payment of $3,000,000 and interest the treasurer might receive any of the outstanding bonds of the state bearing not less than 6 per cent. interest, or of the unpaid coupons thereof at their par value." He not only could receive the bonds, but you might go round, if it would do you any good, and buy up these coupons and pay the debt in that way. At all events, it is quite clear, taking those two sections together, that the legislature intended that the coupons to the bonds were to be provided for as well as the bonds themselves. That view of it is confirmed also by the original act of 1851. The fifth section of that act is: "The said bonds thus issued to the Pacific Railroad Company shall be denominated 'Pacific Railroad state bonds,' and the said bonds thus issued to the Hannibal & St. Joseph Railroad Company shall be denominated 'The Hannibal & St. Joseph Railroad state bonds;' and the faith and credit of this state are hereby pledged for

the payment of the interest"—interest being mentioned first—"and the redemption of the principal thereof." Now, that was an obligation which the state assumed in the original act, that she would pay the interest and redeem the principal. Section 9 says:

"Each of said companies shall make provisions for the punctual redemption of the said bonds so issued as aforesaid to them, respectively, and for the punctual payment of the interest which shall accrue thereon, in such manner as to exonerate the treasury of this state from any advances of money for that purpose."

The state obliged herself to pay the interest, and she also obliged the Hannibal & St. Joe Railroad Company to pay the interest which should accrue thereon; not only what the state had paid, but "in such manner as to exonerate the treasury of the state from any advances of money for that purpose."

Can we believe that when the act of 1865 came to be passed by the state it intended anything less than this? Can we believe that it intended to modify that principle as to what should be paid, what should be secured, or how she should be indemnified; that it intended to make it any less strong or secure than it was; or that any less should be demanded or paid than was required by the act of 1851? On the contrary, the very language which I have read and undertaken to criticise attempts to make more. It says all indebtedness which is due, which is owing, and all liability. It has added other words distributively to enforce the principle that the state is to lose nothing; that she is to suffer nothing; that whenever you come in and want to get rid of this statutory mortgage, or, rather, have it turned over to you, (for you do not merely get rid of it—you keep it alive to have it turned over to you,) you are to do certainly as much as was required by the act of 1851, and if anything had occurred since that requiring you to do more, you are to do it. It says, "all liabilities."

I have no question, and neither have my brethren on the bench, that that is the true and sound construction of the act of 1865, and inasmuch as that has not been done, the power vested in the governor by the original act of 1851, to sell on default of interest, remains.

It is said, however, that since the state has accepted the principal, and the amount of interest that may be yet due by these trustees or the railroad company, or the obligation that may yet rest on them, is uncertain, and has not yet been ascertained, we must, by injunction, restrain the governor from selling. That is a misapplication of the

doctrine on that subject.    The governor is endeavoring now to enforce the payment of a sum which is ascertained and well known.    It is the last past-due instalment of interest, which amounts to $90,000, I suppose.    There is no difficulty about it.    If you want to pay it, well and good; if you do not, the governor has a right to sell.    What will happen after the sale it will be time enough to consider then. You can prevent it.    If you want your road, go and pay this $90,000, —that is, by saving the state from the obligation of paying it; or, if the state has paid it, by repaying it to her; and when that is done, if this particular proceeding is not stopped by the governor, we will stop it.    But I have no idea that there will be any occasion for a resort to that.    The governor will never want to do any more than make you pay this interest as it accrues, and save the state harmless.

Perhaps I ought to stop there, because that decides the motion before us, and I may not be here if the case ever comes up on anything else.    But I think it not inappropriate to make a remark or two further, with a view of seeing if the state and the complainants can not be brought together in such a manner as to prevent a great and unnecessary loss—a loss which might be prevented if each party would do what there is some moral obligation to do; and in some respects, I will say, what there may be a legal obligation to do.    I am of opinion that the decision of the supreme court of the state does not preclude us from holding the act of 1865 valid, in the view that we take of it, whatever it might be if it was construed as complainants say it should be.    I am of opinion, therefore, that the act of 1865 is a subsisting, valid act, and a rule of moral and legal obligation for the state and for these parties complainant.    I am also of the opinion that the state having accepted, or got this money into her possession, is under a moral obligation (and I do not pretend to commit anybody as to how far its legal obligation goes) to so use that money as, so far as possible, to protect the parties who have paid it against the loss of the interest which it might accumulate, and which would go to extinguish the interest on the state's obligations.    I am of opinion, also, that it is the duty of these gentlemen, if they further seek to get the benefit of this statutory lien, to indemnify the state absolutely against any loss that may accrue on account of the unpaid interest on these three millions of bonds.

I do not know that I ought to say anything about the particular manner in which that should be done.    I think I am quite safe in saying that if they will go and purchase up and get cut off of any 6 per cent. bonds of the state of Missouri as many coupons as will

amount to the coupons on those $3,000,000 and present them to the governor, they ought to have the assignment of this statutory lien. Of course, many of these coupons having a long time to run, you can buy at a discount. It would not be, as some counsel say, as if all this sum were due now. Much of this is only due along through future periods. I might make a few observations as to the manner in which the parties could get together and do right as between themselves. I think the honor of the state of Missouri will make her do as nearly right as possible, and if the parties complainant accept this opinion—and if they do not they can appeal after a final decree —I hope they and the respondent will be brought together so that the equitable principle which is involved in the act of 1855, (which I still think is in existence,) that the state should be fully indemnified and these parties made to lose as little as possible, will govern the case. The motion for an injunction is overruled.