# ROLSTON v. MISSOURI FUND COMMISSIONERS.

## MISSOURI FUND COMMISSIONERS v. ROLSTON.

### APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

Argued December 1, 2, 1886. — Decided March 7, 1887.

The State of Missouri having loaned its credit to the Hannibal and St. Joseph Railroad Company for $3,000,000, upon a first lien of the road and property of the company, the legislature on the 20th February, 1865, authorized that company to mortgage its road and property to trustees to secure an issue of bonds to that amount, and further enacted that whenever those trustees should "pay into the treasury of the state a sum

### Statement of Facts.

of money equal in amount to all indebtedness due or owing by said company to the state, and all liabilities incurred by the state by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the state, together with all interest that has and may at the time when such payment shall be made have accrued and remain unpaid by said company, and such fact shall have been certified to the governor of the state by the treasurer," the governor should "make over, assign, and convey to the trustees aforesaid all the first liens and mortgages now held by the state." The act further required the state treasurer to receive of, the trustees in payment of the $3,000,000 any outstanding bonds of the state, bearing not less than six per cent. interest, or any of the unpaid coupons thereof at their par value. *Held*, that this meant that if payment was made in money, and not in state bonds or coupons, it must be of an amount equal to the face value of the bonds issued to the company and the accrued interest thereon to the time of payment, together with such further sum, if any, as would be necessary to enable the state to cancel then, or within a reasonable time thereafter, $3,000,000 of its outstanding liabilities, bearing interest at the rate of six per cent. per annum.

The act of the General Assembly of Missouri of March 26, 1881, to provide for the transfer to the sinking fund of surplus money in the treasury, recognized the act of February 20, 1865, providing for the reduction of the state indebtedness, and constituted an agreement, on the part of the state, that all moneys paid into the treasury by the railroad company should be put into the state debt sinking fund, and that all option bonds should be called in and paid as soon as it could lawfully be done; and the use of the money so paid in taking up six per cent. bonds of the state operated to discharge the company from liability for the payment of either the principal or interest of an equal amount of the bonds which had been issued for its benefit.

The provisions of the Constitution of the State of Missouri which went into effect November 30, 1865, relating to the lien held by the state upon any railroad, or to the release of the indebtedness of any corporation to the state, do not prevent the state authorities from complying with the requirements of the acts of February 20, 1865, and March 25, 1881, respecting the lien upon the Hannibal and St. Joseph Railroad and the debt of that company to the state, when the company has performed the acts required by the statutes to be done upon its part.

This suit is brought to compel state officers to do what a statute of the state requires them to do, and is not a suit against the state, but against the officers. *Louisiana v. Jumel*, 107 U. S. 711, distinguished.

THIS was a bill in equity to restrain the fund commissioners of the State of Missouri from selling the Hannibal and St. Joseph Railroad. Both parties appealed. The case is stated in the opinion of the court.

*Mr. John F. Dillon* and *Mr. Elihu Root* for Rolston and others. *Mr. Sidney Bartlett* also filed a brief for same.

*Mr. D. A. De Armond* and *Mr. John B. Henderson* (*Mr. George H. Shields* was on their brief), for the Missouri Fund Commissioners. *Mr. B. G. Boone,* Attorney General of Missouri filed a brief for same.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This was a suit in equity brought by Rosewell G. Rolston, Heman Dowd, and Oren Root, Jr., trustees in a mortgage made by the Hannibal and St. Joseph Railroad Company, a Missouri corporation, to restrain the executive officers of Missouri from selling the mortgaged property under prior statutory mortgages in favor of the state, on the ground that the liability for which the earlier liens were created had been satisfied, and that they, as trustees, were entitled to an assignment of those liens.   The material facts are these:

The Hannibal and St. Joseph Railroad Company was incorporated by the State of Missouri under a statute for that purpose, approved February 16, 1847, to build and operate a railroad from Hannibal, on the Mississippi River, to St. Joseph, on the Missouri.   Stats. Missouri, 1847, 156.   To expedite the construction of the road the state passed an act, which was approved February 22, 1851, Stats. Missouri, 1851, 265, to issue to the company its own bonds as a loan of credit, redeemable at the pleasure of the legislature at any time after the expiration of twenty years from the date of their issue, with interest, payable semiannually, at the rate of six per cent. per annum, in the city of New York, on the first days of January and July in each and every year.   The acceptance of these bonds by the company was to operate as a mortgage on its road "for securing the payment of the principal and interest of the sums of money for which such bonds shall . . . be issued and accepted. . . ."   The company also became bound to "make provision for punctual redemption of the said bonds so issued . . . to them, . . . and for the punctual payment of the interest which shall accrue thereon in such manner as to

exonerate the treasury of" the "state from any advances of money for that purpose." If default should be made by the company in the payment of either the principal or the interest, the governor was authorized to sell the road at auction, first giving a required notice.

Under the authority of this statute bonds were issued by the state to the company at different times between December 28, 1853, and September 24, 1856, to the amount of $1,500,000, for which the company and its railroad became bound in the manner specified.

On the 10th of December, 1855, the company not having then completed its road, another act was passed by the General Assembly, Stats. Missouri, 1855, No. 2, 472, authorizing a further loan of the credit of the state, in bonds, to the amount of $1,500,000. These were to be thirty years bonds. Section 2 of this act was as follows:

"§ 2. The loan of the state's credit under this act shall be, and it is hereby declared to be, upon the condition of a first lien or mortgage, as contained and reserved in the act of February 22, 1851, hereinbefore recited, and the same shall in all respects be held to be an extension of the loan of state credit, under the said mortgage provisions, securing the state in this as in the former loan, upon the same equal and unrestricted basis, as to each and every bond of the state so issued, under said acts or either of them."

Under this authority other state bonds were issued to the company to the prescribed amount, maturing as follows:

| | |
|---|---|
| November 10, 1886 | $ 500,000. |
| February 28, 1887 | 1,000,000 |

On the 20th of February, 1865, the following act of the General Assembly of Missouri was approved. Stats. Missouri, 1865, 84.

"An Act to Provide for Reducing the Indebtedness of the State.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. The Hannibal and St. Joseph Railroad Company is hereby authorized to issue its bonds, signed by the

president and countersigned by the secretary of the company, in sums of one thousand dollars each, with coupons attached, bearing interest, payable semiannually, at the rate of six per cent. per annum, and having not less than ten years to run, and to the amount of three millions of dollars, the payment of the same, with the accruing interest, to be secured by a mortgage or deed of trust conveying to three trustees, to be named therein, by and with appropriate forms of expression, and for the purpose of securing the payment of said bonds and interest, and for no other purpose, on the road of said company, with all its franchises, rolling-stock, and appurtenances, subject, however, to all the liens and liabilities existing in favor of the state by virtue of any law of the state at the time said bonds may be issued and delivered.

"SECTION 2. Whenever the trustees provided for in the first section of this act shall pay into the treasury of the state a sum of money equal in amount to all indebtedness due or owing by said company to the state, and all liabilities incurred by the state by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the state, together with all interest that has and may at the time when such payment shall be made have accrued and remain unpaid by said company, and such fact shall have been certified to the Governor of the state by the treasurer, who is hereby directed to make such certificate, then the Governor of the state is hereby authorized and required to make over, assign, and convey to the trustees aforesaid all the first liens and mortgages now held by the state under the provisions of an act of the legislature of the state approved February 22, 1851, to secure the payment of a loan of the credit of the state to said railroad company in the sum of one million five hundred thousand dollars; and also of an act of the legislature approved December 10, 1855, to secure the payment of a like loan of the credit of the state in the sum of one million five hundred thousand dollars; and such conveyance shall, by appropriate expressions, convey to said trustees all and singular the rights, titles, and interests held by the state under the several acts of the legislature, as aforesaid, in and to said railroad, its rolling-

stock, franchises, and appurtenances, to hold the same as security for the payment of the bonds of the road authorized by the first section of this act, and the interest thereon, with full power to sell and dispose of the same, in case of the failure of said company to meet and pay, at maturity, the interest or principal of said bonds, or any of them, and to have and exercise all the rights and powers which belong to the people of the State of Missouri, and which, by the provisions of the acts of the legislature, as aforesaid, they might have exercised by and through the Governor of the state: *Provided*, That nothing in this act shall be construed so as to render the State of Missouri liable in any case for the payment of the bonds or interest thereon, authorized to be issued by the first section of this act.

" SECTION 3. The treasurer of the state is hereby authorized and directed to receive of the trustees aforesaid, in payment of three millions of dollars, and interest, as provided in the second section of this act, any of the outstanding bonds of the state bearing no less than six per cent. interest, or of the unpaid coupons thereof, at their par value.

" SECTION 4. The true intent and meaning of this act is to place the persons and parties who may hold the bonds of the road authorized to be issued by the first section of this act, through the trustees herein provided, in the same legal position which the people of the State of Missouri now hold, with full powers to act in the premises as the said state, by its Governor, might have done; and it shall be the duty of such trustees to proceed to advertise and sell the road with its appurtenances, as aforesaid, and in the manner provided for the sale of the same by the Governor of the state in the acts of the legislature aforesaid, whenever they shall receive a request so to do in writing, signed by persons and parties representing not less than one third of the bonds authorized to be issued by the first section of this act, and which may be still outstanding, but only in case the said railroad company shall have made default in the payment of the principal or interest on said bonds when the same has become due, and all needed authority to do the same shall be maintained, and all needed decrees shall be

issued by and in any court of competent jurisdiction in this state, either in law or equity, and such sale, so made as herein provided, shall be deemed and held in all respects good and valid in law.

" SECTION 5. The provisions of this act shall not be construed to modify, release, exonerate, discharge, or relieve said railroad company from any duty, liability, obligation, penalty, or forfeiture to which, under former laws, said company may be liable to the people of the State of Missouri, on any account whatever, except from the payment of the several sums of money as is in this act provided.

" SECTION 6. This act to take effect from and after its passage."

When this act was passed, it is said in the brief of the Attorney General, " the bonds of the state were worth in the market from 65 to 69 cents on the dollar, and there were outstanding, on January 1, 1865, state aid bonds loaned to different railroad companies to the amount of many millions of dollars, beside $833,000 of other state bonds, and over $5,000,000 of past due coupons on state aid bonds loaned to the railroads." The testimony shows conclusively that no interest had been paid on any of the aid bonds except those of this company since January 1, 1861.

On the 21st of March, 1874, an act of the General Assembly of Missouri, " to authorize the issue of new state bonds in renewal of certain other bonds heretofore issued to the Hannibal and St. Joseph Railroad Company, and to maintain and perpetuate the first lien of the state to secure the payment thereof," was approved. Stats. Missouri, 1874, 123. Down to this time the company had not availed itself of the privileges of the act of February 20, 1865, but it had promptly met and provided for, at maturity, the interest on all its state bonds. By this new act it was provided that whenever the owner or owners of any of the bonds issued to the company under the authority of the act of February 22, 1851, " shall present such bond or bonds for renewal to the treasurer of the state, and shall satisfy such treasurer that he or they are the real and *bona fide* holders and owners of such bond or bonds, and that

the same have not been paid by the state, or by the said company, and that they have not been taken up and placed in the hands of the trustees to secure the payment of other bonds issued by said company, as authorized by the act entitled 'An act to provide for reducing the indebtedness of the state,' approved February 20, 1865, the treasurer shall certify the facts to the Governor of the state, and the Governor shall thereupon cause to be issued in renewal of such old bonds, and deliver to the holder or holders thereof, new bonds of the State of Missouri, in lieu thereof, said bonds to be signed by the Governor and countersigned by the Secretary of State, sealed with the seal of the state, and registered in the office of the state auditor, and they shall be of the same denomination and tenor of the old bonds, for which they are to be exchanged; and they shall have the same rate of interest with like coupons, and be payable in the same time and manner as said old bonds."

Ample provision was then made for the preservation of the original security, and the company was made liable for the payment of the renewal bonds to the same extent and in the same way it had been for the originals. The company formally accepted the provisions of this act, and under it renewal bonds were issued to the amount of $1,499,000, one of the original bonds for $1000 having been paid. These renewal bonds mature as follows:

| | |
|---|---:|
| July 1, 1894 | $500,000 |
| July 1, 1895 | 203,000 |
| January 1, 1896 | 165,000 |
| July 1, 1896 | 614,000 |
| July 1, 1897 | 17,000 |

The company having at all times met the interest on these bonds as it matured, as well as that on the bonds issued under the act of 1855, the board of directors, on the 19th of January, 1881, adopted a plan for refunding its debt, which contemplated a discharge of its obligations to the state in the way provided for in the act of February 20, 1865. A few days previous to this time the officers of the state had been infor-

mally approached on the subject, but on that day negotiations were regularly opened by the following letter from the president of the company to the Governor of the state :

"Hon. Thos. T. Crittenden,

"*Governor of the State of Missouri.*

"Dear Sir : It is the desire of the directors of the Hannibal and St. Joseph Railroad Company to relieve the State of Missouri from the burden which the state assumed in pursuance of a wise and liberal policy to aid the construction of the road when the company was in its infancy.

"The interest upon the three millions of state aid bonds has been regularly paid by us, including the coupons due January 1st, 1881. We now wish to pay into the treasury of the state the entire sum of principal and the accrued interest since that date, in fulfilment of the obligation which rests upon the company to provide for the payment of bonds. This course appears to have been contemplated in the act of the Legislature of the State of Missouri, entitled 'An act to provide for reducing the indebtedness of the state,' approved February 20th, 1865. So long a time has elapsed since the passage of that act that we have considered it our duty to communicate with you upon the subject, in the first instance, in order that there may be a full understanding and coöperation in the action of the railroad company and the officers of the state.

"We should be very glad to receive any suggestion which may occur to you affecting the convenience of the state, or the duties of the officers of the state, depending upon our proposed action. It is our desire to complete the transaction as soon as possible after the period which must expire before a meeting of the company can be had to approve the necessary arrangements.

"I remain, with great respect, your obedient servant,

"Wm. Dowd, *President.*"

After this letter was received by the Governor, Mr. Walker, the auditor of state, went to New York, where he had an

interview with the officers of the company. At this interview propositions were made on both sides, but no conclusion was reached. On the return of Mr. Walker from New York he made a report in writing to the Board of Fund Commissioners, under date of February 24, 1881, giving an account of what he had done and the suggestions he had made. This report was communicated by the Governor to the General Assembly the next day, accompanied by a message, of which the following is a copy:

"EXECUTIVE OFFICE,

"CITY OF JEFFERSON, February 25, 1881.

"SIR: I have the honor to lay before you a communication from Hon. John Walker to the Board of Fund Commissioners of Missouri. Mr. Walker, as a member of that board, recently visited the city of New York for the purpose of conferring with the officers of the Hannibal and St. Joseph Railroad Company in regard to the proposition of that company to discharge the full amount of what it claims is its present indebtedness to the state. The result of Mr. Walker's conference with those officials is fully set forth in the accompanying communication.

"I recommend that you adopt such legislation as will enable the Fund Commissioners to use or dispose of whatever sum, if any, may be accepted by the state from the Hannibal and St. Joseph Railroad Company.

"I do not mean to say that the state will accept the sum of $3,000,000 in complete satisfaction of the liability incurred by the state in aid of said company. I think the liability extends to the maturity of the bonds; and as the company has heretofore met its obligations to the state promptly, and has thereby secured the confidence of the people of the state, who were for many years in doubt as to the final result of our complications with that road, I trust that it will be equally as honorable in the future, and so act as to retain the confidence which its past conduct has inspired.

"In case the whole or any part of the money due from the

company is accepted, its receipt ought not to find us unprepared for its prompt and profitable disposal.

"Very respectfully,

"Thos. T. Crittenden.

"Hon. T. P. Bashaw, Speaker of the House of Representatives."

Afterwards the General Assembly passed the following act, which was approved March 26, 1881. Stats. Missouri, 1881, 191:

"An Act to provide for the transfer to the state sinking fund [of] any surplus money that may be in the state treasury, not necessary to defray the current expenses of the state government and to meet the appropriations made by law, and to authorize the Fund Commissioners to invest the same in the redemption or purchase of the bonds of the state and bonds of the United States, Hannibal and St. Joseph Railroad bonds excepted.

"Be it enacted by the General Assembly of the State of Missouri, as follows:

"Section 1. Whenever there is any money in the state treasury not necessary to defray the current expenses of the state government and to meet the appropriations made by law, it shall be the duty of the state auditor, and he is hereby authorized and required, to transfer the same to the credit of the State Sinking Fund for the purpose of paying the state debt, or any portion thereof, and the interest thereon as it becomes due.

"Sec. 2. Whenever there is sufficient money in the sinking fund to redeem or purchase one or more of the bonds of the State of Missouri, such sum is hereby appropriated for such purpose, and the Fund Commissioners shall immediately call in for payment a like amount of the option bonds of the state, known as 'five-twenty bonds.' *Provided*, That if there are no option bonds which can be called in for payment, they may invest such money in the purchase of any of the bonds of the state, or bonds of the United States, the Hannibal and St. Joseph Railroad bonds excepted."

On the 30th of April, 1881, the company executed to Rolston, Dowd, and Root, trustees, a mortgage such as was contemplated by the act of February 20, 1865, and in which the provisions of that act were recited, to secure an issue of bonds to the amount of $3,000,000. These bonds were negotiated by the trustees, and with the money realized therefrom, and $90,000 furnished by the company, they, on the 20th of June, 1881, paid to the treasurer of state the full face of the bonds of the state for which the company was liable, and the unpaid interest thereon, to fall due July 1 thereafter, the total amount of principal and interest being $3,090,000, and demanded from him the certificate provided for by the act of February 20, 1865, to entitle them to an assignment from the Governor of the liens of the state. The treasurer thereupon gave the trustees a receipt, of which the following is a copy:

"Treasurer's Office, State of Missouri,
"City of Jefferson, June 20, 1881.

"Received of R. G. Rolston, Heman Dowd, and Oren Root, Jr., trustees Hannibal & St. Joseph Railroad Company, three million and ninety thousand dollars $\frac{00}{100}$ on account of the statutory mortgage now held by the State of Missouri against said railroad.

"In testimony whereof I have hereunto set my hand and affixed my seal of office the day and year above.

"$3,090,000:        (Signed)        Phil. E. Chappell,
                                       "Treasurer."

[The State treasurer's seal of office.]

At the same time he gave to them the following certificate:

"To Thomas T. Crittenden,
        "Governor of Missouri.

"I, Phil. E. Chappell, treasurer of the State of Missouri, do hereby certify that R. G. Rolston, Heman Dowd, and Oren Root, Jr., trustees, have paid into the treasury of the State of Missouri three millions and ninety thousand dollars, ($3,090,000,) under the act entitled 'An act to provide for reducing the indebtedness of the state,' approved February 20, 1865, on

account of the statutory mortgage the state holds against the Hannibal & St. Joseph Railroad Company.

"Given under my hand this 20th day of June, 1881.

"(Signed)                    PHIL. E. CHAPPELL,

"*State Treasurer.*"

He refused to put the certificate in any other form, although requested to do so by the company.

No special provision was made by the company for the payment of the interest which fell due January 1, 1882, and on such failure the Governor threatened to take measures for the enforcement of the lien which the state held under its statutory mortgages as upon a default by the company in the payment of interest. Thereupon the trustees began this suit, on the 6th of January, 1882, which was at first against the Governor alone, to have him execute the assignment provided for by the act of 1865, and also to enjoin him from selling the road under the statutory mortgage. On the filing of the bill a temporary restraining order was granted by the circuit judge. Afterwards, on the 10th of February, 1882, the court in session, being of opinion that the payment which had been made did not operate as a satisfaction of the obligation of the company to the state under the act of 1865, refused to grant a temporary injunction, but did not pass further on the rights of the parties. *Rolston* v. *Crittenden,* 10 Fed. Rep. 254.; *S. C.* 3 McCrary, 332. The company thereupon, to stop a sale by the Governor, paid to the state the interest which fell due January 1, 1882, and the cause proceeded without any injunction. Afterwards, on the 20th of March, an amended and supplemental bill was filed, on leave of the court, by which Chappell, the treasurer of state, and Walker, the auditor, were added as parties, and the railroad company also. The Governor and auditor, with whom was united D. H. McIntyre, were also proceeded against as Fund Commissioners of the state, so that, if necessary, a decree might be had for a return of the money which had been paid. In other respects the prayer of the bill was not materially changed. Answers and replications were filed and testimony taken. After hearing upon bill, answers,

replication and proofs, a decree was entered September 15, 1882, to the effect that the trustees were entitled under the act of 1865 to an assignment by the Governor of the liens of the state upon payment to the treasurer of state of a sum of money, which, together with that already paid, if it had been applied and invested within a reasonable time in accordance with the provisions of the act of March 26, 1881, would have indemnified the state against loss by reason of its obligation to pay interest on the bonds to their maturity, and "that the complainants were and are entitled to have the said $3,000,000 paid as aforesaid to the said treasurer of the State of Missouri, under the provisions of the aforesaid act of February 20, 1865, applied and invested under and in accordance with the provisions of the said act of March 26, 1881, to the payment of the option bonds of the State of Missouri known as 5–20 bonds as rapidly as they were subject to call and payment, and in the meantime, and until such bonds became subject to call and payment or other portions of the state debt or interest thereon became due, to have the remaining and unapplied balance of the said moneys invested in bonds of the United States at the market rates, and when any portion of the said 5–20 bonds became or should become subject to call and payment, or any portion of the state debt or interest thereon became or should be subject to redemption or payment, to have the said moneys applied from time to time to the redemption or payment thereof."

The case was then referred to a master to ascertain and report "what sum, including the said $3,000,000, was necessary to indemnify the state as aforesaid, if the same were applied and invested as hereinbefore provided within reasonable time in the exercise of due diligence by the officers of the state after the 20th of June, 1881." In this decree the Governor was enjoined from selling the road until a final judgment in the cause.

From the report of the master it appears that after the order of the court referring the case, the state officers used $1,446,000 of the money that had been paid in by the company to take up and pay an equal amount of option and other bonds of the

state which might have been called in at different times before while the money was in the treasury to the credit of the sinking fund. The remainder of the money was then invested, as it might have been before, in state bonds and United States bonds, at rates which would yield an interest on the investment equal to three per cent. per annum.

The court below gave a decree finding the amount to be paid to the state before the trustees could claim an assignment of the prior liens, calculated on the basis of applying the payment to taking up the bonds which had been issued to the company as they matured, and crediting the fund with six per cent. interest on the amount actually used to take up other bonds than those issued to the company at the rate of six per cent. from the time it ought to have been so used, and on the remainder at the rate of three per cent. per annum, which it was agreed was all that the investment that had been made in the purchase of state bonds and United States securities would produce. The amount thus found to be due was $476,049.27, and interest at the rate of three per cent. per annum from May 11, 1883.

The officers of the state claimed that the amount due should have been ascertained by charging the company with the face of the bonds and interest to the date of their maturity, and crediting it only with the amount invested and the interest thereon at the rate of three per cent. until actually used to take up the bonds for which the company was liable.

Each of the parties appealed from this decree.

What the state did under the acts of 1851 and 1855 was to loan its credit to the railroad company. For this purpose it issued its bonds, with coupons for semiannual interest attached, redeemable part at the end of twenty years and part at the end of thirty. These bonds were delivered to the company to be disposed of to raise money to enable it to expedite and secure the completion of its railroad, and in this way the state incurred a liability for the company not only to pay the principal of the bonds to the holders thereof, but also to pay the interest semiannually, at the rate of six per cent. per annum, on some, for at least twenty years, and on others for thirty.

The holder could not be required to take the principal and stop the interest until the state had the right by the terms of the bond to pay the principal. This was the liability of the state to the holders of the bonds for the benefit of the company, and the corresponding liability of the company to the state was to provide the state with the means for the punctual payment of the interest as it matured during the whole time the bonds had to run, and of the principal when it fell due. The company could no more require the state to take the principal before it became due and stop interest thereafter, than the state could require the bondholders to do the same thing. The liability of the company to the state was identical with that of the state to the bondholders, for the duty of the company was to make such provision for the payment of both interest and principal as would " exonerate the treasury of the state from any advances of money for that purpose."

This was the condition of the liability of the parties to and for each other under the original statutes when that of February 20, 1865, was enacted, during the late civil war, while the state was largely in default for interest on its debt and when of necessity its securities were much depreciated. The avowed purpose of the statute was, according to its title, to reduce the indebtedness of the state, and it related only to the Hannibal and St. Joseph Company, which was not in default for either the interest or the principal of the bonds it was bound to make provision for. That company was authorized to raise money to get up the lien on its property in favor of the state, and pass it over to the holders of the new security upon the faith of which the money was to be got. Such a transfer could be obtained by paying " into the treasury of the state a sum of money equal in amount to all indebtedness due or owing by said company to the state, and all liabilities incurred by the state by reason of having issued her bonds and loaned the same to said company as a loan of the credit of the state, together with all interest that has and may at the time when said payment shall be made have accrued and remain unpaid by said company," (§ 2,) or by delivering to the treasurer " any of the outstanding bonds of the state bearing no less than six

per cent. interest, or . . . unpaid coupons thereof at their par value," amounting to "three millions of dollars and interest:" that is to say, to the amount of the bonds issued to the company by the state and the accrued interest thereon, which had not already been paid by the company. (§ 3.) This, as we construe the statute, means that if payment is made in money and not in state bonds or coupons, it must be of an amount equal to the face value of the bonds issued to the company and the accrued interest thereon to the time of payment, together with such further sum, if any, as would be necessary to enable the state to cancel then, or within a reasonable time thereafter, three millions of dollars of its outstanding liabilities, bearing interest at the rate of six per cent. per annum.

This, we think, is shown in many ways. The avowed purpose of the act was to reduce the debt of the state. This could not be done by a simple payment by the company to the state of the amount of the bonds for which that company was liable. To reduce the debt there must be a payment by the state to its own creditors and an actual cancellation of its own obligations. As by accepting the money the state discharged the company from all further obligation to provide for the payment of the principal or the interest of the bonds for which it had become bound, it was necessary, in order to save the state from loss in the transaction, that the payment by the company should be enough to enable the state to take up and cancel an equal amount of its other indebtedness bearing the same rate of interest. The apparent object of the statute was to relieve the state to some extent from its immediate embarrassments. There was then existing a past due interest-bearing debt in the shape of unpaid coupons, amounting to more than the face value of the bonds for which the company was liable, and if the payment had been made at or about that time, the money could have been used at once in discharging an equal amount of debt then due and unpaid, without loss to the company or the state. Looked at in the light of the surrounding circumstances, the statute appears like a plan by the state to get relief to some extent from its present embarrassments by an arrangement which would be equivalent to an issue of new

bonds, payable at the times when those which had been lent to the company fell due. Apparently the state was in no condition to borrow at favorable rates upon its own credit, and so a scheme was devised by which the prior lien of the state upon the railroad of this company might be used for that purpose, without any actual loss to the state and possibly with some advantage to the company, for the company was allowed to make its payment in any of the bonds or past due coupons of the state bearing six per cent. interest at their par value, and if these could be got at a discount the company would be correspondingly a gainer.

Thus it appears that if the payment had been made at or near the time the statute was enacted, an equal amount of the interest-bearing debt of the state, which was immediately pressing for payment, could have been taken up, and a cancellation of the obligations of the company secured. But no such payment was made, and the question now is whether, sixteen years afterwards, when the credit of the state had been reëstablished without any help from the company, and when all its six per cent. interest-bearing securities were commanding a high premium, the payment of the same amount would produce the same effect so far as the company was concerned.

Under the statute of 1865, as has already been seen, if payment was made in money, it must be of a sum, in addition to the face of the bonds, which would enable the state to take up and cancel an equal amount of its other six per cent. indebtedness then outstanding. Accordingly, when the company offered the amount of the face of the bonds only, and interest, the state officers insisted upon more, and, the parties failing to come to a satisfactory understanding on the subject, the whole matter was referred by the Governor to the General Assembly then in session. The statute of March 26, 1881, was the result of this reference, and, construed in connection with the circumstances which surrounded its enactment, it may be looked upon as a direction to the state officers to take the money when offered by the company and use it as fast as needed to pay the option bonds when they were called in, which must be done at the earliest possible moment, and in the redemption and pay-

ment of other state bonds as they fell due. Whatever amount was not so used at once was to be invested and kept invested until it should afterwards be needed for that purpose. In this way the act of 1865 was recognized as being still in force, with the effect we have already given it, and the use of the money paid into the treasury by the company in taking up the six per cent. bonds of the state, whether option bonds or others, was made to operate as a discharge of the company from all liability for the payment of either the principal or interest of an equal amount of the bonds which had been issued for its benefit. The Fund Commissioners were also required to use the money as fast as it was needed for the payment of called or maturing bonds.

With this statute in force the company paid and the state officers received the money in question. There is some conflict of testimony as to what took place between Mr. Walker, the auditor of state, and the officers of the company, in New York, in February, 1881, and also as to what occurred between the company and the state officers when the payment was made in June of the same year; but we have not deemed it necessary to give either of these matters any considerable attention, because the officers of the state could only do what was authorized by the statutes which were enacted for the government of their conduct in the matter, and the rights of the parties depend alone upon the legal effect of those statutes.

By the constitution of Missouri, which went into effect in 1875, Art. X, § 14, it is made the duty of the legislature to levy and collect annually a tax sufficient to pay the accruing interest on the bonded debt of the state, and to reduce the principal thereof annually $250,000. This $250,000 is to be paid into and made a part of the sinking fund of the state. The tax thus provided for has been regularly levied and collected.

From the report of the master it now appears that $1,446,000 of the money paid in by the company was actually used by the Fund Commissioners on or before the 23d of August, 1882, in taking up option and other bonds of the state, and that if this sum had been actually applied for that purpose at

the times when the bonds so taken up became subject to call or payment, and the remainder of the fund had been applied to taking up other bonds of the state as they became due and payable, after making due allowance for the proper use of the $250,000 constitutional sinking fund each year, including the year 1881, it would require a further payment by the company, on the third day of October, 1882, of $153,646.46, to entitle the company to a discharge of its liability to the state on account of the bonds, and the trustees to an assignment of the liens of the state. It is conceded that the calculation of the master is right. The only question is as to the correctness of the principles on which it rests, and of this we are satisfied. In passing the act of March 26, 1881, the state substantially said to this company that any money it paid into the treasury under the act of 1865 should be put into the sinking fund and used as soon as it was needed to meet the maturing debt of the state, and that in order to use it at the earliest possible moment all option bonds should be called in and paid as soon as it could be done according to law. Inasmuch as, before the act of 1881 was passed, the state had by its constitution made it imperative that a certain amount should be raised each year by taxation and paid into the sinking fund to be applied to the liquidation of the state debt, it is but right that this should be exhausted as far as available before the money of the company is used, but after that is exhausted the statute made it the duty of the commissioners to use any other money there might be in the fund to pay its bonds, whenever the right to make such payment should be complete. The state was not required to do this, but it did it, and the executive officers must govern themselves accordingly. It may be true, that if no such provision had been made, money might have been got by the state to take up such of its maturing bonds as could not be met by the accumulations of the annual contributions to the sinking fund out of the tax which the constitution had provided for that purpose, at a less rate of interest than six per cent., and thus a saving made, but this was for the consideration of the legislature when it passed the statute, not for the state officers afterwards. The state had the right

to pass the law, and when passed it was binding on those whose duty it was to obey.

It was said, however, in argument, that if the acts of 1865, and 1881 are construed in this way they are invalid, because in conflict with the following provisions of the Missouri constitution, which went into effect November 30, 1875:

Article IV., Sec. 50. "The General Assembly shall have no power to release or alienate the lien held by the state upon any railroad, or in any wise change the tenor or meaning, or pass any act explanatory thereof; but the same shall be enforced in accordance with the original terms upon which it was acquired."

Sec. 51. "The General Assembly shall have no power to release or extinguish, or authorize the releasing or extinguishing, in whole or in part, the indebtedness, liability, or obligation of any corporation or individual, to this state, or to any county or other municipal corporation therein."

The Supreme Court of Missouri did say in *State v. Chappell,* 74 Mo. 335, a suit brought by these trustees to compel the state treasurer to give them a certificate of payment in the form required by the act of 1865 to enable them to get from the Governor an assignment of the state's liens, that if the statutes required the acceptance of the $3,090,000 at the time it was paid in full satisfaction of the liability of the company to the state they were unconstitutional and void. But here the question is whether the same result must follow when the statutes are construed so as to require the payment of a sum of money which will enable the state to take up an equal amount of its other indebtedness bearing an equal rate of interest, and we have no hesitation in saying it does not. Section 50 deals with the lien, and section 51 with the "indebtedness, liability, or obligation." The lien cannot be released or alienated until the debt is extinguished, and the debt cannot be released or extinguished except in the manner contemplated by the law under which it was created, or by something legally equivalent. Here there is a payment of the obligation in advance of its maturity, with a view to the use of the money so paid by the state in taking up other debts at

their maturity for which no other provision has been made. This is, in our opinion, the legal equivalent of a payment of the liability of the company in accordance with the original terms on which it was created. By the acts under which the payment was made the money was appropriated for use in this particular way. In the meantime it was to be kept invested until that use could be made, the company indemnifying the state against its liability for interest in the meantime. A statute having such an effect violates neither the letter nor the spirit of the constitution, which was no doubt intended, as was said by the Supreme Court of Missouri in the case just cited, to prevent the " frittering away " and " extinguishment " of " the liens held by the state on railroads " without payment in full. The payment in this case in the way which the statutes contemplate will be the complete legal equivalent of such a " payment in full."

It is next contended that this suit cannot be maintained because it is in its effect a suit against the state, which is prohibited by the Eleventh Amendment of the Constitution of the United States, and *Louisiana* v. *Jumel*, 107 U. S. 711, is cited in support of this position. But this case is entirely different from that. There the effort was to compel a state officer to do what a statute prohibited him from doing. Here the suit is to get a state officer to do what a statute requires of him. The litigation is with the officer, not the state. The law makes it his duty to assign the liens in question to the trustees when they make a certain payment. The trustees claim they have made this payment. The officer says they have not, and there is no controversy about his duty if they have. The only inquiry is, therefore, as to the fact of a payment according to the requirements of the law. If it has been made, the trustees are entitled to their decree. If it has not, a decree in their favor, as the case now stands, must be denied; but as the parties are all before the court, and the suit is in equity, it may be retained so as to determine what the trustees must do in order to fulfil the law, and under what circumstances the Governor can be compelled to execute the assignment which has been provided for.

*The decree of the Circuit Court is reversed, so far as it fixed the amount to be paid to get an assignment of the lien, and the cause remanded with instructions to strike out the sum of $476,049.47, with interest from May 11, 1883, as the amount found due, and insert in lieu thereof $153,646.46, and interest at the rate of three per cent. per annum from October 3 1882. In all other respects the decree is affirmed; each party to pay its own costs in this court, the expenses of printing the record and the fees of the clerk for supervision to be taxed one half to each.*

Mr. Justice Blatchford took no part in the decision of this case.