[Civil No. 3923. Filed April 18, 1938.]

[78 Pac. (2d) 483.]

WILLIAM ALBERTS, State Land Commissioner of the State of Arizona, R. C. STANFORD, JAMES H. KERBY, HARRY M. MOORE, ANA FROH-MILLER, and JOSEPH W. CONWAY, Constituting the State Land Department of the State of Arizona, and SEVENTY–SIX CATTLE COMPANY, a Corporation (Intervener), Appellants, v. W. H. McGIRK, ELLA E. McGIRK, ORA A. McGIRK and GORDON B. McGIRK, Appellees.

Mr. Joe Conway, Attorney General, and Mr. Elmer C. Coker, Assistant Attorney General, for Appellant Land Department and Commissioner.

Messrs. Mathews & Bilby and Mr. T. K. Shoenhair, for Appellant Intervener.

Mr. D. V. Mulhern, Mr. B. H. Gibbs and Mr. D. L. Cunningham, for Appellees.

LOCKWOOD, J.—This is an appeal by the state land commissioner and the state land department, hereinafter called defendants, from a judgment of the superior court of Maricopa county granting a peremptory writ of *mandamus* commanding them to issue certificates of purchase for certain lands owned by the state of Arizona, in favor of W. H. McGirk, Ella E. McGirk, Ora A. McGirk, and Gordon B. McGirk, hereinafter called plaintiffs. The Seventy-Six Cattle Company, a corporation, hereinafter called intervener, intervened in the trial court and has joined in the appeal.

The action arose out of the following state of facts: The lands involved herein, being all of section 2, lots 5, 6, 7, and 8, and the south half of the north half, and the south half of section 3, and the east half of section 4, township 10 south, range 22 east, Gila and Salt River Base and Meridian, were selected by the state of Arizona and conveyed to the state by the United States in the year 1915 or 1916 under grants of the Enabling Act. The whole of the lands are nonmineral and nontimbered grazing lands of such a character that they may be sold by the state of Arizona to private purchasers. About the 6th day of December, 1927, one of the plaintiffs, W. H. McGirk, filed in the state land office an application to purchase a portion of said lands. These applications were not acted upon at that time in any way other than the accepting of the filing fee. On the 17th of September, 1935, the state land commissioner, Charles P. Mullen, wrote McGirk, referring to his application of 1927, stating that the

land department was contemplating holding a sale of state land in Graham county, and asking whether he was still interested in purchasing the land described in his application. McGirk immediately filed a further application to purchase the remaining part of the land hereinabove described. At this time, and at the time of the sale of the lands hereinafter referred to, the lands had been leased to the intervener for many years. Nothing was said in the application as to whether or not the lands were at the time under lease to any other party, since the blanks furnished for applicants by the land department made no request for such information, but it was stated that there were certain improvements on a part of the lands consisting of a four-wire fence which belonged to the Chiracahua Ranches Company; this company having at the time under lease the west half of section 4. The leases of intervener were, of course, recorded in the land department, and the applications some time after their receipt were marked by the department, showing such leases. Shortly after the filing of the last application to purchase the land in question, the commissioner instructed his secretary to start the sale in Graham county, and to take whatever steps were necessary for that purpose. Thereafter, under such instructions, all the lands, and the fence which plaintiffs stated belonged to the Chiracahua Ranches Company, were examined on the ground and appraised in accordance with the law, and the report submitted to the commissioner. These appraisements showed that the land was under lease to the intervener, and that the fence in question was owned by the Chiracahua Ranches Company, and certified copies of these appraisements were mailed by the secretary of the commissioner to the Chiracahua Ranches Company and to the intervener. A notice to the public of the sale of the said lands was sent to the "Graham County

Guardian," at Safford, Arizona, and published therein. On the 12th day of February, 1936, a notice of the sale was sent by registered mail to the intervener, care William Webb, Bonita, Arizona, and on the 30th day of March a copy of the published notice of sale was sent to the same address, unregistered. The record does not show that either of these letters was returned to the department. On April 7th, in accordance with the notice of sale above referred to, the lands in question were offered for sale at Safford, Arizona, by the chief clerk of the department, and at such sale the plaintiffs were the highest bidders for the land in question and the one mile of fence, and thereupon paid to the land department all the sums required to be paid under their bids, and receipts were issued to them for the payments. This sale was duly reported to the commissioner. Upon April 7th the commissioner notified the county assessor of Graham county that the land had been sold to the plaintiffs and that it should be assessed to them for taxes, describing the land particularly, and on April 8th wrote to plaintiff W. H. McGirk, stating that he must secure a bill of sale for the fence from the owners, and on April 22d again wrote him inclosing certificates of purchase for the land, and requesting that he have them signed by the respective purchasers as required by law and returned to him for completion. This was done by the purchasers.

At some time before the 5th of May, 1936, but after the certificates of purchase had been sent by the land commissioner to the McGirks to be signed by them, W. T. Webb, who was then and had been for years president of intervener, went to the home of the commissioner, and there had a conversation with him in regard to the transaction. Immediately after this conversation, and under date of May 5, 1936, the commissioner wrote the following letter to W. H. McGirk:

"Notice is hereby given that the certificates of purchase Nos. 5322, to 5326, Inc., issued to you on the 7th day of April, 1936, conveying Sections 2 and 3 and the E½ of Section 4, Township 10 South, Range 22 East, is hereby ordered for cancellation, for the reason and upon the grounds that the sale at which you purchased said lands was held by mistake and was therefore void and had no force or effect whatsoever. The mistake being that the improvements upon said lands should have been appraised in the name of W. T. Webb; Mr. W. T. Webb claims to have not known of the sale; it is not the policy of this office to break into a grazing set-up of another party, and for the further reason that the certificates of purchase, or any other instrument in this office is not finally complete until the signature of the Commissioner is attached thereto, which has not been done in this case.

"For these reasons I hereby declare that the purported sale was void and had no force or effect whatsoever, and I do, therefore, order that said certificate of purchase is hereby ordered for cancellation.

"Kindly return the original certificate of purchase so that the same may be placed upon the records of this office as cancelled and refund issued to you.

"You are advised that you have twenty days from the date of this order in which to appeal from said order to the State Land Department."

Thereafter plaintiffs filed with the state land department a document setting up in detail the facts in regard to the sale of the land which we have summarized, and concluding with the following language:

"The premises considered, we now, and hereby, respectfully ask and urge that the Honorable Arizona State Land Board will immediately direct the Arizona State Land Commissioner to complete and deliver to the successful bidders and purchasers, aforesaid, each and every the said certificates of purchase."

The department treated this as an appeal from the decision of the commissioner, and on October 7th the matter came on for hearing before it, at which time

evidence was submitted by plaintiffs and by the intervener, together with a statement by the commissioner as to why he had refused to sign the certificates of sale which, in substance, was the same as that set forth in his letter of May 5th to W. H. McGirk, and the department made the following order:

"At a continuation of the meeting at 10:00 A. M., Thursday, October 8th, the board unanimously voted to sustain the decision of the Commissioner."

Thereupon plaintiffs instituted this action against the commissioner and the department, asking that a writ of *mandamus* be issued directing the defendants to issue and deliver to the respective plaintiffs their certificates of purchase. The lower court, after hearing the evidence, found all the material issues, both of law and evidence, in favor of the plaintiffs and against defendants and intervener, and ordered that the certificates of purchase be duly issued and delivered, whereupon this appeal was taken.

The defendants seek to justify their refusal to issue and deliver the certificates of purchase on two grounds: (a) That it was discretionary with the commissioner and the department to refuse to issue such certificates; and (b) that if it was not discretionary, their finding that the sale was made by mistake and not in accordance with law was conclusive, and that under section 2996, Revised Code of 1928, which reads as follows:

"*Cancellation of unlawful sales.* Any sale made by mistake, or not in accordance with law, or obtained by fraud, shall be void and the certificate of purchase issued thereon shall be void, and the holder of such certificate shall surrender the same to the commissioner, who shall, except in case of fraud, cause the money paid thereon to be refunded to the holder of such certificate, and make compensation to the holder for the actual value of the improvements placed on

said land by the purchaser. Such value shall be determined by the board of appraisers and paid out of the general fund,''

the sale was void. We will consider these propositions in their order.

We have had before us in several cases the question of the relative jurisdictions of the state land commissioner and the state land. department. The first of importance is that of *Campbell* v. *Caldwell,* 20 Ariz. 377, 181 Pac. 181, 183. At that time the law in regard to the respective duties and authority of the state land department and the commissioner was set forth in chapter 5 of the Second Special Session of 1915, which reads in part as follows:

''Sec. 2. *Creation of Department—Commissioner.* There is hereby created a department of state, which shall be known as the State Land Department. Said department shall consist of the Governor, the Secretary of State, the Attorney General, the State Treasurer and the State Auditor, who shall serve without extra compensation. The Governor shall be *ex-officio* chairman of the department. Said department shall appoint a State Land Commissioner, who is hereby clothed with the powers of surveyor general and shall hold office until his successor shall have been appointed and qualified. Subject to the control and direction of the State Land Department, the commissioner shall have charge of and administer the state lands and shall exercise the powers and perform the duties hereinafter set forth.''

''Sec. 3. *Duties and Powers of Department.* The department is hereby authorized to sell and lease all lands owned or held in trust by the State, under such provisions as are hereinafter provided, and under such other rules and regulations, not in conflict with the provisions of this Act, as the department may direct; to hold semi-monthly meetings, at which time all disputes, grievances and other matters pertaining to the administration of state lands may be heard by said department; and to perform all of the duties

heretofore imposed by law upon the State Land Commission.''

The powers and duties of the commissioner were set forth somewhat in detail in sections 8 and 9 of the act, but there was no specific right of appeal from his decisions as to leases or sales given by the act. In construing all these sections we said:

''While, under these provisions, it is manifest that the immediate negotiations for the leasing of lands were intended to be carried on by the commissioner, it seems quite clear that his acts and conduct in that regard are 'subject to the control and direction of the State Land Department,' composed of the Governor and other state officers named, and, while his acts might be efficacious where no 'disputes, grievances, or other matters pertaining to' a given contract of lease arise, when such do intervene it appears action by the department as such is contemplated. By section 3, *supra,* it is made the duty of the department to lease all lands owned or held in trust by the state, and 'to hold semimonthly meetings, at which time all disputes grievances and other matters pertaining to the administration of state lands may be heard by said department.'

''The appellee's complaint fails to show that his grievance or dispute was ever presented to the department for action, or that the department as such ever refused to give him a lease. We think, aside from any other question, before an applicant for a lease may maintain this kind of action, he should be required to present, or offer to present, his grievance to the department for action. Until that is done, he cannot, nor can the court, know what the action of the department might be. Had he adopted the remedy of appealing to the department, he might have satisfied the members thereof that he was entitled to a contract of lease. We think, at all events, that it was the intention of the Legislature to give to an aggrieved applicant to purchase or lease lands an opportunity to appear before, and submit his case to, the department as such; and it would also seem, as a corollary to that,

that he must do so before he can invoke the aid of the court to compel the department to act. The power to make leases lies with the department and not the commissioner (sections 2 and 3). This duty or power is again stated in section 38, wherein it is provided that 'the department is hereby authorized to execute leases and contracts for the lease of lands containing' precious and valuable minerals and valuable natural deposits. The appellee, in making the department and the members thereof defendants in his action, concedes as much, and exposes the weakness of his position in failing to invoke their power to review his grievance against or dispute with the commissioner before asking the court to compel action.''

The question arose a little later as to whether the land department had the right to set aside and vacate its own orders and grant rehearings. This was after the passage of chapter 166 of the Laws of 1919. In the cases of *Hunt* v. *Schilling*, 27 Ariz. 1, 229 Pac. 99; Id., 27 Ariz. 235, 232 Pac. 554, 555, we held that the land department and commissioner having once made a judicial determination had no right to grant a rehearing of the issue determined, and that their jurisdiction terminated with their decision. We further held that chapter 166 of the Laws of 1919, though it did provide for an appeal from the decision of either the commissioner or the department when leases were involved, did not specifically give the right of an appeal from a decision of the commissioner to the land department. But we further held that the department had still a general supervisory jurisdiction over the action of the commissioner, in the following language:

''So far as the second point is concerned, I do not find where the act of 1919 takes away from the Land Department the supervisory jurisdiction over the Commissioner which we held was given when we decided *Campbell* v. *Caldwell*, 20 Ariz. 377, 181 Pac. 181. The act merely provides an additional remedy of

appeal made from the decision of the Land Commissioner or from the Land Department itself. I cannot agree with counsel that the appeal can be taken only from the decision of the Commissioner. The act expressly states that the appeal may be taken 'from any decision of the Commissioner of the State Land Department and from the State Land Department.'

"If the decision of the Commissioner is final, why was an appeal provided for from the Department? It surely is not to be seriously contended that the act of 1919, in its few short provisions was meant to make the Land Commissioner entirely independent of the Department. The supervisory jurisdiction of the Land Department over the Land Commission still exists, unless the matter is taken out of the Land Department by an appeal from the decision of the Commissioner himself.

"It is argued that an adequate remedy at law was an appeal from the decision of the Commissioner of the Land Department instead of an action for *mandamus*, but the appellant in this case is satisfied with the only legal decision of the department and has nothing which he wishes to appeal from. All he asks is that the Land Department through its Commissioner will carry out its own decision, and if it will not it is difficult to see how else he could compel it to act."

■ At this time, therefore, under the law as it was held to exist, an appeal might be taken from the decision of the commissioner to the land department and from the decision of the department to the superior court; but when once a decision was made by either the commissioner or the state land department acting judicially on a matter, such decision could not be reviewed nor set aside on a motion for rehearing, the jurisdiction of the department being exhausted.

The Land Code was revised in 1928. Section 2947 of that Code reads as follows:

"*Creation of department, duties; commissioner.* There shall be a department of the state, to be known

as the state land department, which shall consist of the governor, the secretary of state, the attorney general, the state treasurer and auditor, who shall serve without extra compensation. The governor shall be *ex-officio* chairman of the department. The department shall appoint a state land commissioner, with the powers of surveyor general. The department may sell and lease all lands owned or held in trust by the state, as hereinafter provided, and hold semi-monthly meetings, at which time all disputes, grievances and other matters pertaining to the administration of state lands may be heard.''

It will be noted that by this section it is still the department which has the power to sell and lease any lands owned by the state, and not the commissioner. Sections 2964 to 3002, Revised Code of 1928, deal with the method in which state lands were to be leased or sold. Section 2966 reads as follows:

''*Appeal by applicant; notice.* An applicant to lease state land may appeal from a decision of the commissioner to the department, and from the department to the superior court of the county in which the land is situated. The party appealing shall give notice thereof in writing to the commissioner or department from whose decision the appeal is taken and to the adverse applicant, within twenty days from the rendition of the decision. Thereafter such proceedings shall be had in the superior court as on an appeal from an appraisement.''

This expressly granted the right of appeal from the commissioner to the department and from the department to the superior court on decisions involving the *lease* of state lands, but there is no provision in the statute which allows an appeal from a decision authorizing the sale of such lands. We think, however, following the reasoning laid down in the cases previously cited, that the action of the commissioner in regard to the sale of state lands is under the supervisory control of the state land department in

the same manner as we held the *leasing* of state lands was, in the absence of the statute, but that there is no appeal to the superior court from the decision of the department when a sale is involved. In other words, the action of the land department, in the exercise of its supervisory discretion, may not be reviewed by the superior court when a sale of state land is concerned.

The question of whether state lands shall or shall not be sold depends on the statute. Without going into detail, we think that there can be no doubt that it is made discretionary with the land department, in the absence of a statute specifically commanding the sale. When, therefore, one desires to purchase state lands and makes application therefor to the commissioner in the manner provided by law, it is discretionary with the department whether the land shall or shall not be sold, but, as we have said, when this discretion is once exercised and a decision made, the latter cannot be set aside by either the commissioner or the department. In the present case, the commissioner, in the exercise of his discretion, determined that the lands in question should be sold, and proceeded to follow the various statutory steps prerequisite to a sale, up to and including the time when the sale had been made, the lands had been paid for and certificates of sale sent to the purchasers for their execution and return to the land department. In the usual order of business, the commissioner would then have signed them and delivered them to the purchaser for recording, for, under the provisions of section 2993, *supra,* such certificates may be recorded as deeds of conveyance, and when their terms have been fully executed, the purchaser is entitled to a patent.

We are of the opinion that when the land had been struck off and the purchase price paid, the discretion of the commissioner had been fully exercised

and exhausted, and all that remained for him was the purely ministerial act of executing the certificates after they had been signed by the purchasers. If, therefore, the land department itself did not set aside his actions, or if the sale was not declared void under section 2996, *supra,* following the rule laid down in *Hunt* v. *Schilling, supra,* and *Campbell* v. *Caldwell, supra,* a writ of *mandamus* would lie against the commissioner to enforce the execution of the certificates, for his duty was plain and ministerial, and there was no discretion left him.

■■ But defendants and intervener urge that the land department, when for the first time it appeared in the picture, used its discretion to set aside the action of the commissioner. The question then is: How long does the supervisory discretion of the land department last? Is it indefinite or is there a time when the failure of the department to act takes away its right of action? If the department may at any time after the issuance of certificate or patent set aside the sale merely because, in the exercise of its discretionary right, it concludes that the sale should not have been made, there is no certainty in the purchase of state lands, and titles are worthless. While the legislature might have the power to establish such a rule, it has not done so, and we think a conclusion so repugnant to justice should not be implied. Since the statute is silent, we must resort to well recognized principles of law which would obtain in a similar situation between private parties. Assume that A, the owner of certain real estate, gives B, his agent, the right to sell it under certain conditions. B secures a purchaser, C, negotiates with him the terms of the sale in strict accordance with the rules previously laid down by A, and receives the purchase price therefor. We are satisfied that any court would hold that while

A might have intervened at any time up to the final completion of the agreement of purchase between B and C, when the contract is finally concluded, his right of intervention has ceased, and he is bound by the actions of B, his lawfully authorized agent. Applying this most just and equitable rule to the present situation, the commissioner is the agent of the land department for the purpose of selling the state lands. The department has carefully laid down many rules as to the manner in which this sale should be made. At any time up to the completion of the contract of sale, the department, in the exercise of its supervisory discretion, may stop proceedings, but when all that remains is a purely ministerial act on the part of the commissioner, as representing the department, we think, in the absence of a statute declaring the contrary rule, that the discretion of the department has terminated, and that it is bound by the acts of its lawfully authorized agent, its commissioner.

It is true that under section 2996, *supra,* the sale is void if it is made as the result of a mistake, or not in accordance with law, or is obtained by fraud, and defendants have set this up in the action as a defense. The question of whether or not the sale was made by mistake, or was not made in accordance with the terms of the law, or was obtained by fraud, is a judicial one and can be determined only by a court of proper jurisdiction. The opinion of the commissioner and the department as to the existence of these facts is, therefore, no more than the opinion of any private individual who thinks he has a defense to an action, and the issue was very properly submitted to the superior court for its determination. We have examined the transcript of evidence presented to the court most carefully. It is obvious that no mistake, in the sense the law defines the word as ground for the

cancellation of a contract, existed. The question is whether it was made in accordance with law, or whether it was obtained by fraud on the part of the purchasers. The alleged violation of law set up is (a) that the notice of sale was not published in the newspaper nearest the location of the land to be sold; and the only claim of fraud is (b) that the improvements on the premises were wrongfully described by the applicant McGirk as belonging to the Chiracahua Ranches Company when, as he well knew, they belonged to the Seventy-Six Cattle Company. It was also alleged that it was contrary to the policy of the land department to break up a grazing unit, and that the sale had that effect. This last, of course, while it might well have been considered by the commissioner and the department in the use of their discretion as to whether the lands should be sold, is irrelevant when the question is whether the law governing the sale was violated. The evidence in regard to the proper newspaper in which to publish the notice of sale, and the ownership of the improvements and McGirk's knowledge thereof, was in sharp conflict. The trial court resolved it in favor of the plaintiffs and we, of course, are bound by its conclusion. Since, therefore, the sale was not void under the provisions of section 2996, *supra,* it was the duty of the commissioner to issue certificates of sale to the purchasers in accordance with the prayer of their complaint, and the trial court properly made the alternative writ of *mandamus* peremptory.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.