**CLACKAMAS COUNTY, ORE., a Political Subdivision of the State of Oregon, Appellant,**

v.

**Douglas McKAY, Secretary of the Interior, and Ezra Taft Benson, Secretary of Agriculture, Appellees.**

No. 11844.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 25, 1953.

Decided April 30, 1954.

Petition for Rehearing Denied Oct. 21, 1954.

Judgment Vacated April 18, 1955.

See 75 S.Ct. 599.

480

Messrs. A. W. Lafferty, Portland, Oregon and Richard L. Merrick, Washington, D. C., for appellant.

Mr. Harold S. Harrison, Atty., Dept. of Justice, Washington, D. C., with whom Mr. Roger P. Marquis, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellees.

Mr. Leo A. Rover, U. S. Atty., Mr. Lewis A. Carroll, Asst. U. S. Atty., and Mr. William J. Peck, Asst. U. S. Atty. at the time the brief was filed, Washington, D. C., entered appearances for appellees.

Before EDGERTON, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is a civil action brought in the United States District Court for the District of Columbia by Clackamas County, Oregon, on behalf of itself and seventeen other so-called land grant counties in that State, seeking a *mandamus* directed to the Secretary of the Interior and an injunction to the Secretary of Agriculture.

The controversy concerns the proceeds from the sale of timber from 472,000 acres of public land. This is part of a large tract which has been the subject matter of several acts of Congress and has also been involved in other litigation. There is now on deposit in the Treasury of the United States some $5,000,000 in cash from the sales of the timber on these 472,000 acres. Our appellant, Clackamas County, contends that these moneys should be distributed to it and the other seventeen counties under a specific mandate of the Congress, that the Secretary of the Interior fails and refuses to make such distribution, and that the Secretary of Agriculture is a party to an interdepartmental agreement with the Secretary of the Interior that these proceeds should be withheld from distribution. The Secretaries say (1) that this is a suit against the United States, to which it has not consented, and (2) that the actions sought to be compelled involve discretionary matters which may not be controlled by mandatory injunction. The controversy has a long history.

Because this opinion will be lengthy, we have indicated its subdivisions by the use of numbers as follows: (I) the land grant acts of Congress, the Joint Resolution of 1908, and the Supreme Court decision in 1915; (II) the 1916 Act of Congress; (III) the lawsuit in the District Court of the United States for the District of Oregon, United States v. Oregon & C. R. R.; (IV) the 1926 and 1937 Acts of Congress; (V) the present controversy and the questions presented; (VI) the doctrine of sovereign immunity and the rule as to judicial compulsion of ministerial duties of administrative officials; (VII) the opinion of the Supreme Court in Larson v. Domestic & Foreign Corp.; (VIII) a further discussion of sovereign immunity; (IX) authorities cited by the appellee Secretaries; (X) whether the actions of the Secretaries were discretionary; (XI) the views of our dissenting judge; (XII) conclusion as to the Secretary of the Interior; (XIII) conclusion as to the Secretary of Agriculture; and (XIV) directions to the District Court.

I

In 1866 Congress made to the California and Oregon Railroad Company a grant of public lands, consisting of every odd-numbered alternate section to the amount of twenty alternate sections per mile (ten on each side) of the railroad line.[1] The Act provided that, when any of these sections should be found to have been occupied or otherwise disposed of, other lands should be selected by the railroad in lieu thereof. These other lands, which came to be known as "lieu lands" or "indemnity lands", were to be in odd-numbered sections not more than ten

---

1. 14 Stat. 239.

miles beyond the limits of the primary grant.

In 1869 Congress amended the granting act so as to provide, among other things, that the lands granted should be sold to actual settlers only, in quantities not greater than one-quarter section to one purchaser and for a price not exceeding $2.50 per acre.[2] The railroad proceeded to violate this latter proviso, making sales of from 1,000 to 20,000 acres to one purchaser at prices ranging from $5 to $40 an acre and, in one instance, a sale of 45,000 acres at $7 an acre to a single purchaser.[3]

The matter came to the attention of Congress, and in 1908 a Joint Resolution was adopted directing the Attorney General to institute court proceedings to protect the rights of the United States, including a claim that the lands granted to the railroad had been forfeited to the United States by reason of violations of the terms of the granting acts.[4] The suit was brought and reached the United States Supreme Court.[5] The Court held against forfeiture but held that the railroads should be enjoined from any disposition of the lands until Congress should have an opportunity to provide for their disposition "and at the same time secure to the defendants [the railroads and their assignees] all the value the granting acts conferred upon the railroads." [6]

## II

Pursuant to that opinion of the Court the Congress in 1916 passed an act,[7] which referred to the foregoing circumstances in a series of "Whereases" and provided that the title to so much of the lands granted to the railroad as had not been sold prior to July 1, 1913, was thereby revested in the United States. The Congress then proceeded, in the Act, to direct what should be done with the land thus revested. It provided that the Secretary of the Interior, "in cooperation with the Secretary of Agriculture, or otherwise," should classify "said lands" into (1) power-site lands, (2) timber lands, and (3) agricultural lands; that the Secretary should sell the timber on the timber lands for cash; and that the non-mineral agricultural lands should be subject to entry and sale under the homestead laws. The Congress then dealt with the problem of compensating the railroad, which it was required to do by the Supreme Court ruling. The Act authorized and directed the Attorney General to institute a suit against the railroad "to have determined" the amount of moneys which had been received by the railroad on account of any of "said granted lands" and which should be charged against the railroad as part of the "full value" secured under the granting acts as interpreted by the Supreme Court. The Act repeatedly used the word "determination" in describing the contemplated action by the court. The Congress then dealt with the disposition of the money which it anticipated would be derived from the revested lands. The Act provided that all moneys received on account of "said lands and timber" should be deposited in the Treasury of the United States in a special fund to be designated "The Oregon and California land-grant fund",[8] "which fund shall be disposed of in the following manner: * * *." Then followed a formula for the computation of the parts to be distributed. It provided for the payment from the fund of the amounts due the railroad and certain lienholders and for certain accumulated taxes. It then provided for the payment of the annual balances of the fund, in stated percentag-

2. 16 Stat. 47.

3. Oregon & C. R. R. Co. v. United States, infra note 5.

4. Pub.Res. 18, 60th Cong., 1st Sess., 35 Stat. 571.

5. Oregon & C. R. R. Co. v. United States, 1915, 238 U.S. 393, 35 S.Ct. 908, 59 L.Ed. 1360.

6. Id., 238 U.S. at 439, 35 S.Ct. at 926, 59 L.Ed. at 1397.

7. 39 Stat. 218.

8. Id. at 222.

es, to the state treasurers of the states in which the lands were located, to the treasurers of the counties in which the lands were situated, and to the reclamation fund of the United States, the remainder to become part of the general fund in the Treasury of the United States. The statute provided: "The payments herein authorized shall be made to the treasurers of the States and counties, respectively, by the Treasurer of the United States, upon the order of the Secretary of the Interior, as soon as may be after the close of each fiscal year during which the moneys were received: * * * *." [9]

The philosophy and purpose of the statute are plain upon a reading of the congressional debate which preceded its enactment. The original land grant statutes were designed to promote the development of the West and, in this case, of the Oregon territory. The building of the railroad was conducive to the migration of people and goods. The railroads through sale of the land were supplied with funds, and the condition that the land be sold to settlers in small parcels and at a cheap price was to serve the cause of extensive settlement. The action of the railroad in selling the land to large purchasers, chiefly to lumber interests, frustrated this design. According to the Representatives in Congress from Oregon, the people in that State were bitter in blaming the Federal Government for inaction in this situation for over fifty years. Moreover, the proposed revesting of title in the United States would remove from the tax rolls of the State these huge tracts of land, theretofore taxable, and in this transition the schools and roads of the State would suffer. Congress recognized the justice of these claims, and it was for this purpose that it directed a division of the proceeds from the lands among the states, the counties, and the Federal Government. The debate was long and vigorous, every section of the bill being dis-

cussed. The Oregon Representatives proposed an amendment which would have given Oregon 80 per cent of the proceeds from the land instead of the 50 per cent which the bill provided; but that amendment was rejected on a roll-call vote. The debate in the House appears in Volume 53 of the *Congressional Record* at pages 8579–8619 and 8648–49.

### III

The lawsuit authorized by the 1916 statute was brought by the United States as plaintiff against the Oregon and California Railroad Company in the District Court of the United States for the District of Oregon. It was a suit for an accounting. The theory of the Act, as the court described it, was "that the railroad company should account to the government for these moneys received by it to which it was not entitled, while the government at the same time obligated itself to pay to the railroad company the full value, namely, $2.50 per acre, for every acre of land to which it was entitled under the grants." [10] The court said: "Such being the thought and purpose, it becomes a matter of inquiry for ascertaining the exact acreage to which the railroad company was and is entitled as of right under its grants, and thereby determining the aggregate of the 'full value,' as declared by the Supreme Court." [11] Many of the facts were stipulated, as, for example, that within the primary limits of the grants were 4,218,-902.69 acres. But there were many disputes, some of which were whether certain specified parcels of land were or were not within the grants. To accomplish its task and to decide the ultimate issue of amount, it was necessary for the court, as it announced, to determine these disputed issues. The court rendered a long opinion, making detailed findings upon the various items in dispute. It considered various disputes concerning land included in the primary grants. It then advanced to a consider-

9. Id. at 223.

10. United States v. Oregon & C. R.R. Co., D.C.Or.1925, 8 F.2d 645, 647.

11. Ibid.

ation of certain controverted areas lying within the indemnity limits of the grant. There were twelve such items. The 472,-000 acres with which we are here concerned constituted Item 13(k). That item was described by the court as follows:

"(k) 472,000 acres, the mineral or nonmineral character of which had not been determined, were included within the limits of national forests by proclamation of the President of the United States. Of this area 190,000 acres were withdrawn for forest purposes prior to June 29, 1900, and the remainder were withdrawn subsequent to that date." [12]

The court first considered the general status of the indemnity lands and recited the well-settled rule that, where a deficiency within granted primary limits is so great that the indemnity lands would not make good the loss, no formal selection of the indemnity land is necessary to fix the right of the grantee to the entire indemnity land. The court then considered the items one by one.

In respect to Item 13(k) the question was whether the railroad company should have credit for these 472,000 acres, i. e., whether the railroad was entitled to $2.50 for each of these acres. If they had been granted to the railroad, had not been sold, and had been revested in the United States, the railroad was entitled to that credit. These acres lay within the indemnity limits of the grant, but they had been included by proclamation of the President within the limits of national forest reserves. If they had been validly granted to the railroad, they were not subject to appropriation by the President for forest reserves; on the other hand, if they were not within the grant, they were valid forest reserves and could not be included within the acreage for which the railroad company was entitled to be paid. That was the issue on Item 13(k). The court decided that these particular lands had been granted to the railroad and were not public lands at the

time the Presidential proclamations had been issued. The court said:

"All these reserves and additions were set apart by the President long subsequent to the time, as shown by the evidence, that a deficiency was found to exist within the indemnity limits to meet the losses sustained to the place limits, and it was therefore inadmissible for the government to reserve or appropriate to its own use any of such lands. The lands, by reason of the deficiency, as we have seen in our examination of item 13 (i), had previously and necessarily become appropriated to meet the losses sustained to the place grant. They were not at that time a part of the public domain, and were unsusceptible of appropriation by the government." [13]

Judge Wolverton, who was the District Judge in the case, had also been the trial judge in the case which went to the Supreme Court in 1915, and was thus thoroughly familiar with the problem.

The Oregon court gathered its several findings together into a decree. That decree read in pertinent part as follows:

"(1) That the title to * * * all unpatented lands for which the defendant, Oregon and California Railroad Company, was entitled to receive patents under the grants as amended of July 25, 1866, and May 4, 1870, be quieted and confirmed in the plaintiff; * * *.

"(2) That 3,727,889.94 acres were included within the grants * * * and that the said Oregon and California Railroad Company * * * is entitled to receive $2.50 per acre for said acreage * * *.

* * * * * *

"(4) That said acreage * * * includes the following described acreage within the indemnity limits of the grants, to-wit:

* * * * * *

12. Id. at 655.

13. Id. at 660.

"472,000 acres included within the limits of the National Forest."

The decree was entered in 1925. The decision was not appealed.

The purpose of the foregoing lawsuit was an accounting between the United States and the railroads upon the land grants and the revesting. Basic to that accounting was a determination of what lands had been granted to the railroad. The court determined that the 472,000 acres in Item 13(k) had been so granted. Not by the farthest stretch of imagination could that conclusion be said to be *dictum*. It was part of the foundation upon which the accounting was based. The determination that these acres had been granted and, being unsold, were revested placed them squarely within the terms of the 1916 Act. As revested land they were subject to every provision of that Act, including the provisions that the Secretary of the Interior should classify "said lands" and sell the timber on lands of "class two" thereof; that all moneys received on account of "said lands and timber" should be deposited in the special account; and also those provisions concerning the payments to the counties in which "said lands" are situated, and concerning payments from the balance remaining "in said Oregon and California land grant fund".

The Government suggests that the decree of the court contains a proviso which supports its view. That proviso is:

"* * * and provided further that nothing in this decree shall be construed to mean that the 472,000 acres of National Forest lands and the 645.95 acres of Klamath Lake Irrigation Project lands shall be sold under the provisions of Act of Congress of June 9, 1916, known as the Chamberlain-Ferris Act."

The Chamberlain-Ferris Act (referred to in this opinion as the 1916 Act) provided that revested non-mineral land should be subject to entry.[14] The quoted portion of the Oregon court's decree was obviously a precautionary note by the judge, meaning that he did not intend his finding and decree to subject this land to homestead entry and sale and thus to void the reservations of the land by the President for national forests; he was not passing on that subject. He certainly did not mean to deny his whole finding and decree, which was that the land was within the grant and was revested.

It may well be, and probably is, true that upon the revesting the proclamations of the President attached to the lands and they became forest reserves so far as their future was concerned. But that fact could not destroy the specific directions of Congress as to what should be done with moneys received from sales of timber on them.

█ The action in the District Court of Oregon was brought by the United States. Having thus consented, it was a party, and it and all its agents were bound by the court's decision. We think, and hold, that the Secretary of Agriculture and all other Government officers were and are bound to recognize and abide that court's findings.

IV

In 1926 Congress passed an act[15] which required the Secretary of the Interior to pay taxes to the several counties in Washington and Oregon on the revested Oregon and California Railroad Company grant lands, as though these lands had remained privately owned.

In 1937 Congress passed an act[16] which directed the Secretary of the Interior to manage for permanent forest production such of the revested Oregon and California Railroad lands as might be classified as timberlands, and to sell, cut and remove the timber therefrom in accordance with the "principal" of sustained yield. The act authorized the Secretary to restore to homestead entry such of the revested lands as were more suitable for agricultural lands, and to

---

14. Sec. 5, 39 Stat. 220.

15. 44 Stat. 915.

16. 50 Stat. 874, 43 U.S.C.A. § 1181a et seq.

lease for grazing such of the revested lands as he should determine in his discretion might be so used. It provided that all the moneys received on account of grazing should be put in the "Oregon and California land-grant fund" in the Treasury.

Title II of this Act of 1937 read as follows (emphasis added):

"That on and after March 1, 1938, all moneys deposited in the Treasury of the United States in the special fund designated the 'Oregon and California land-grant fund' *shall be distributed* annually as follows:

"(a) Fifty per centum *to the counties in which the lands revested under the Act of June 9, 1916* (39 Stat. 218), *are situated*, to be payable on or after June 30, 1938, and *each year thereafter* to each of said counties *in the proportion that the total assessed value of the Oregon and California grant lands in each of said counties for the year 1915 bears to the total assessed value* of all of said lands in the State of Oregon for said year, such moneys to be used as other county funds.

"(b) Twenty-five per centum to said counties as money in lieu of taxes accrued or which shall accrue to them prior to March 1, 1938, under the provisions of the Act of July 13, 1926 (44 Stat. 915), and which taxes are unpaid on said date, such moneys to be paid to said counties severally by the Secretary of the Treasury of the United States, upon certification by the Secretary of the Interior, until such tax indebtedness as shall have accrued prior to March 1, 1938, is extinguished.

"From and after payment of the above accrued taxes said 25 per centum shall be accredited annually to the general fund in the Treasury of the United States until all reimbursable charges against the Oregon and California land-grant fund

owing to the general fund in the Treasury have been paid: *Provided,* That if for any year after the extinquishment of the tax indebtedness accruing to the counties prior to March 1, 1938, under the provisions of Forty-fourth Statutes, page 915, the total amount payable under subsection (a) of this title is less than 78 per centum of the aggregate amount of tax claims which accrued to said counties under said Act for the year 1934, there shall be additionally payable for such year such portion of said 25 per centum (*but not in excess of three-fifths of said 25 per centum*), as may be necessary to make up the deficiency. When the general fund in the Treasury has been fully reimbursed for the expenditures which were made charges against the Oregon and California land-grant fund said 25 per centum shall be paid annually, on or after June 30, to the several counties in the manner provided in subsection (a) hereof.

"(c) Twenty-five per centum to be available for the administration of this Act, in such annual amounts as the Congress shall from time to time determine. Any part of such per centum not used for administrative purposes shall be covered into the general fund of the Treasury of the United States: *Provided,* That moneys covered into the Treasury in such manner shall be used to satisfy the reimbursable charges against the Oregon and California land-grant fund mentioned in subsection (b) so long as any such charges shall exist.

"All Acts or parts of Acts in conflict with this Act are hereby repealed to the extent necessary to give full force and effect to this Act."

The purpose of this statute is made clear by the Reports and the debate in the Senate.[17] The 1916 and 1926 Acts

17. Sen.Rep.No.1231, 75th Cong., 1st Sess. (1937); H.R.Rep.No.1119, 75th Cong., 1st Sess. (1937); 81 Cong.Rec. 9325–26 (1937).

had been subjected to two basic criticisms. One was that they required the timber to be sold as rapidly as possible and the cut-over lands disposed of. The other was that they required the counties to submit claims for the equivalent of the taxes which would have accrued upon the revested lands, and these taxes were more than the proceeds from the sale of timber and land, creating a deficit due from the federal Treasury. The new Act provided for the management of the timber on a conservation basis and for the payment to the counties of the net proceeds from the sales each year. The intention that these net proceeds be paid to the counties was unmistakable in the Reports and the debate.

The terms and directives of the statutes of 1916 and 1937 were simple and plain. In the first place they dealt with the lands revested by the 1916 Act; they are prescriptions of what should be done with the money derived from land which had first been granted to a railroad and then taken from it. They conferred upon the Secretary of the Interior many duties requiring the exercise of his discretion and judgment. Those duties relate to classification of land, sale of timber, leases for grazing, homestead entries, etc. Then they contain certain mandatory directives to the Secretary, which do not involve any exercise of discretion or judgment on his part. Once he has made the many judgments required and has moneys in his hands arising from transactions respecting the revested lands— sales of land, sales of timber, grazing rentals—he must put those moneys in a special account in the Treasury, the name of which account is specified by the statute; and, when the end of each year arrives and a balance appears in that account, he must distribute that balance to the entities named in the statute in the proportions named in the statute. The Secretary has no discretion whatever in two duties—to deposit the receipts and to disburse the balances left at the end of each year. The statutes make this indisputably clear. That in other respects and for other purposes, *e. g.*, withdrawal from homestead entry or for public purposes, this land may have been reserved by Presidential proclamations, is immaterial. Congress has specifically authorized the sale of the timber from this land, and such sales have in fact been made and the money is in fact in hand. Congress was specific as to what should be done with such money.

## V

For years, however, the mandates of the 1916 and 1937 statutes have not been followed. On the contrary, the moneys received on account of these revested Oregon and California Railroad lands have not been put in an account bearing the name specified by the statute, but have been put in another special account bearing another name. The United States has not conformed to the decisions of the Oregon District Court in the action which the United States itself brought for the purpose of determining what it owed the railroads, which involved what were and what were not granted, and thus revested, lands. Disbursements have not been made to the named entities from the moneys received from the revested lands; the Secretary of the Interior has authorized no such disbursements.

The case presents two questions: *One.* Should the Secretary of Agriculture be ordered by the courts to desist from obstructing compliance by other officials of the United States with the findings and decisions of the Oregon District Court in United States v. Oregon & C. R. R. Co.?[18] *Two.* Should the Secretary of the Interior be directed and required by the courts to comply with the mandatory directives of the 1937 statute and to perform the ministerial duties imposed upon him by that act of the Congress, that is, to deposit the moneys derived from the revested lands of the Oregon and California Railroad in the special account named by the statute and to authorize the Treasurer of the United States to pay to the statutory distributees their stat-

18. 1925, 8 F.2d 645.

[u]tory proportions of whatever balances remain in that account? The answers to both questions are affirmative.

## VI

The principal contention of the Secretaries is that this is an action against the sovereign United States, which has not consented to be sued, and that therefore the action will not lie.

Possible philosophical justification for a doctrine of sovereign immunity in our concept of government is a tempting topic for inquiry.[19] Neither of the two bases—Divine Right or the absolute and irrevocable transfer of power by the people—upon which the doctrine of sovereign power was built[20] exists in our theory of government. And the notion that Government officials can be too busy to respond to a citizen's assertion of rights is the precise antithesis of our proud postulate of government by law. And the amiable recitation that when an officer does right he acts officially but when he does wrong he acts individually is a bit of fiction designed to reconcile the maxim that the King can do no wrong with the plain fact that the King, and every other government, frequently does do very wrong,—a fact which we in this country in no wise attempt to deny.[21] We draw much from the British upon this subject,[22] but there is a basic difference between British sovereignty and our sovereignty. In Britain the government—the Crown and Parliament—is the sovereign.[23] In our system the people are the initial and also the residual sovereign; governments are their servants. The sovereign powers of our legislatures and executive officials are delegated by the people and are limited by the scope of the delegations. After some variations[24] the Supreme Court has in recent years declined to gel the basic theory of sovereignty in our system.[25]

Regardless of the foregoing, however, the law upon the problem before us was settled long ago. The rule is usually stated in terms of ministerial duty, as contrasted with the exercise of discretion. It is an acceptable thesis in our concepts of government that a sovereign action by one branch of government within the scope of its delegated power cannot be impeded or compelled by another branch without consent. Damage or compensation is another problem. When an extended examination is made into any considerable number of the many cases which have dealt with the problem in one form or another, it is easy to see that some such thesis is the philosophical touchstone of the rule which is well-nigh universally applied.

Controversy on the subject arose early in this country. It was, as everybody knows, presented and disposed of by the Supreme Court in Marbury v. Madison.[26] Chief Justice Marshall discussed the problem in its proper size and perspective as one of the fundamental facets of our system of law and government. The opinion is too familiar to require discussion, but two succinct passages are so directly pertinent to our present problem that we quote them:

> "But when the legislature proceeds to impose on that officer other duties; when he is directed peremp-

19. See Block, Suits Against Government Officers and the Sovereign Immunity Doctrine, 59 Harv.L.Rev. 1060 (1946); Weston, Actions Against the Property of Sovereigns, 32 Harv.L.Rev. 266 (1919).

20. 4 Holdsworth, History of English Law 192–195 (2d ed. 1937); 6 id. 296–299.

21. See, e. g., Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq.

22. Pugh, Historical Approach to the Doctrine of Sovereign Immunity, 13 La.L. Rev. 476 (1953).

23. Laski, The Responsibility of the State in England, 32 Harv.L.Rev. 447 (1919).

24. The Siren, 1869, 7 Wall. 152, 74 U.S. 152, 19 L.Ed. 129; Kawananakoa v. Polyblank, 1907, 205 U.S. 349, 27 S.Ct. 526, 51 L.Ed. 834.

25. Keifer & Keifer v. Reconstruction Finance Corp., 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; United States v. Shaw, 1940, 309 U.S. 495, 501, 60 S. Ct. 659, 84 L.Ed. 888.

26. 1803, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60.

torily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others.

"The conclusion from this reasoning is, that where the heads of departments are the political or confidential agents of the executive, merely to execute the will of the President, or rather to act in cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable. But where a specific duty is assigned by law, and individual rights depend upon the performance of that duty, it seems equally clear that the individual who considers himself injured, has a right to resort to the laws of his country for a remedy." [27]

"It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or impropriety of issuing a mandamus is to be determined. Where the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct would be rejected without hesitation.

"But where he is directed by law to do a certain act affecting the absolute rights of individuals, in the performance of which he is not placed under the particular direction of the President, and the performance of which the President cannot lawfully forbid, and therefore is never presumed to have forbidden; as for example, to record a commission, or a patent for land, which has received all the legal solemnities; or to give a copy of such record; in such cases, it is not perceived on what ground the courts of the country are further excused from the duty of giving judgment that right be done to an injured individual, than if the same services were to be performed by a person not the head of a department." [28]

Since Marbury v. Madison the courts have followed its rule, compelling executive Government officials to comply with directives of the Congress where a specific directive imposed a ministerial duty devoid of the exercise of judgment or discretion.[29] Of course *mandamus* has been denied more often than it has been grant-

27. Id., 1 Cranch at 166, 5 U.S. at 166, 2 L.Ed. at 70.

28. Id., 1 Cranch at 170–171, 5 U.S. at 170–171, 2 L.Ed. at 71.

29. See, e. g., Kendall v. United States ex rel. Stokes, 1838, 12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181 (to compel making of credits); Board of Liquidation v. McComb, 1876, 92 U.S. 531, 23 L.Ed. 623 (relating to the use of bonds for liquidation of debt); United States v. Schurz, 1880, 102 U.S. 378, 26 L.Ed. 167 (to compel delivery of a land patent); Butterworth v. United States, 1884, 112 U. S. 50, 5 S.Ct. 25, 28 L.Ed. 656 (to compel issuance of a patent on an invention); Noble v. Union River Logging R.R. Co., 1893, 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (to compel executive officials to refrain from revoking approval of right-of-way over public lands); Roberts v. United States ex rel. Valentine, 1900, 176 U.S. 221, 20 S.Ct. 376, 44 L.Ed. 443 (to compel payment of interest on certain certificates); Garfield v. United States ex rel. Goldsby, 1908, 211 U.S. 249, 29 S.Ct. 62, 53 L.Ed. 168 (requiring Secretary to reinstate an erased name upon Indian rolls for undistributed share in lands); Ballinger v. United States ex rel. Frost, 1910, 216 U.S. 240, 30 S. Ct. 338, 54 L.Ed. 464 (to compel issuance of a land patent); Daniels v. Wagner, 1915, 237 U.S. 547, 35 S.Ct. 740, 59 L.Ed. 1102 (in which the Court described as "too obviously devoid of merit to require anything but statement" the contention that "because a patent of the United States is involved, therefore the United States is a necessary party"); Lane v. Hoglund, 1917, 244 U.S. 174, 37 S.Ct. 558, 61 L.Ed. 1066 (to compel issuance of a land patent); Work v.

ed, but opinions in cases in which the writ was refused throw much light upon the problems.[30] With unremitting regularity the Supreme Court has stated the negative of the rule: *Mandamus* will not issue to control the judgment of an executive officer.[31] But these insistent repetitions emphasize the affirmative converse.

Two recent cases in this court are Higginson v. Schoeneman [32] and American Dredging Co. v. Cochrane,[33] in one of which the grant of *mandamus* was approved; in the other the denial of the writ was approved. Both cases rested upon precisely the same rule. In one it was concluded that the act of the administrative official involved his judgment or discretion, and in the other it was concluded that his action was purely ministerial.[34]

Within the last twenty years the highest courts of thirty-two states have sustained the issuance of *mandamus* to compel ministerial action by administrative officials in government.[35] Within that

United States ex rel. McAlester, etc., Co., 1923, 262 U.S. 200, 43 S.Ct. 580, 67 L. Ed. 949 (to compel approval of a land patent); Work v. United States ex rel. Lynn, 1924, 266 U.S. 161, 45 S.Ct. 39, 69 L.Ed. 223 (to compel payment of a fixed sum monthly to an Indian); Wilbur v. United States ex rel. Krushnic, 1930, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445 (directing disposal of a mining claim).

30. See, e. g., Wilbur v. United States ex rel. Kadrie, 1930, 281 U.S. 206, 50 S.Ct. 320, 74 L.Ed. 809 (to compel restoration to rolls of Indians, in which the construction of a statute was so uncertain as to require legal judgment); United States ex rel. Hall v. Payne, 1920, 254 U.S. 343, 41 S.Ct. 131, 65 L.Ed. 295 (involving construction of a statute, which required judgment and discretion); United States ex rel. International Contracting Co. v. Lamont, 1894, 155 U.S. 303, 15 S.Ct. 97, 39 L.Ed. 160 (to compel signing of a contract); United States ex rel. Redfield v. Windom, 1891, 137 U.S. 636, 11 S.Ct. 197, 34 L.Ed. 811 (to compel delivery of a Treasury draft); United States ex rel. Dunlap v. Black, 1888, 128 U.S. 40, 9 S.Ct. 12, 32 L.Ed. 354 (relating to a pension); United States ex rel. Carrick v. Lamar, 1886, 116 U. S. 423, 6 S.Ct. 424, 29 L.Ed. 677 (to compel a survey); United States ex rel. Goodrich v. Guthrie, 1855, 17 How. 284, 58 U.S. 284, 15 L.Ed. 102 (involving payment of a disputed salary); Decatur v. Paulding, 1840, 14 Pet. 497, 39 U.S. 497, 10 L.Ed. 559 (concerning allowance of a pension). And also see West Coast Exploration Co. v. McKay, 1954, 93 U.S.App.D.C. 307, 213 F.2d 582.

31. See Reeside v. Walker, 1850, 11 How. 272, 52 U.S. 272, 13 L.Ed. 693; United States ex rel. Tucker v. Seaman, 1855, 17 How. 225, 58 U.S. 225, 15 L.Ed. 226; Commissioner of Patents (Holloway) v. Whiteley, 1867, 4 Wall. 522, 71 U.S.

522, 18 L.Ed. 335; United States v. Commissioner (Edmunds), 1867, 5 Wall. 563, 72 U.S. 563, 18 L.Ed. 692; United States ex rel. Ness v. Fisher, 1912, 223 U.S. 683, 32 S.Ct. 356, 56 L.Ed. 610; United States ex rel. Alaska Smokeless Coal Co. v. Lane, 1919, 250 U.S. 549, 40 S. Ct. 33, 63 L.Ed. 1135.

32. 1951, 89 U.S.App.D.C. 126, 190 F. 2d 32.

33. 1951, 89 U.S.App.D.C. 88, 190 F.2d 109.

34. See also the extended discussions by Judge Vinson in United States ex rel. Roughton v. Ickes, 1938, 69 App.D.C. 324, 101 F.2d 248, and Judge Stephens in United States ex rel. United States Borax Co. v. Ickes, 1938, 68 App.D.C. 399, 98 F.2d 271, certiorari denied, 1938, 305 U.S. 619, 59 S.Ct. 80, 83 L.Ed. 395.

35. State ex rel. Holcombe v. Stone, 1936, 232 Ala. 16, 166 So. 602; Alberts v. McGirk, 1938, 51 Ariz. 510, 78 P.2d 483; Golden v. McCarroll, 1938, 196 Ark. 443, 118 S.W.2d 252; Palmer v. Fox, 1953, 118 Cal.App.2d 453, 258 P. 2d 30; People ex rel. Albright v. Board of Trustees of Firemen's Pension Fund, 1938, 103 Colo. 1, 82 P.2d 765, 118 A. L.R. 984; State ex rel. Heimov v. Thomson, 1944, 131 Conn. 8, 37 A.2d 689; City of Macon v. Herrington, 1944, 198 Ga. 576, 32 S.E.2d 517; Murtaugh Highway Dist. v. Merritt, 1938, 59 Idaho 603, 85 P.2d 685; People ex rel. Chamberlin v. Trustees of Schools of Township No. 1 South, etc., 1943, 319 Ill.App. 370, 49 N.E.2d 666; State ex rel. Miller v. Bender, 1936, 102 Ind.App. 185, 1 N.E. 2d 662; Independent School Dist. of Danbury v. Christiansen, 1951, 242 Iowa 963, 49 N.W.2d 263; State ex rel. Downer v. Board of Com'rs of Kearny County, 1937, 146 Kan. 461, 72 P.2d 67; McFarland v. Withers, 1938, 274 Ky. 65, 118 S.W.2d 156; State ex rel. Richardson

same recent period many other state supreme courts have discussed and affirmed the rule.

It is suggested to us that, whenever property or money of the United States is involved in a lawsuit, the United States is a necessary party. Of course it is a general rule of law that, when a plaintiff directly attacks the title to a piece of property, the owner is an indispensable party. That rule applies whether the owner is the United States or a private person. There are many cases, e. g., condemnation, trespass to try title, bill to quiet title, to foreclose, etc., applying that rule to property owned by the United States.[36] Of the same nature are suits in which complainants seek to compel a transfer of title by the owner of property; the owner, whether the United States or not, is an indispensable party.[37] And there are cases involving sales of Government property, where Congress has authorized an executive official to dispose of the property and a plaintiff has sought to control or restrain that official's action. Authority to sell includes discretion and judgment as to terms, conditions, time, etc.[38] Such are United States ex rel. Goldberg v. Daniels[39] and Larson v. Domestic & Foreign Commerce Corp.[40]

## VII

Some confusion has arisen because of the idea that the opinion of the Supreme Court in Larson v. Domestic & Foreign Commerce Corp. was a complete summation of all the rules relating to the issuance of *mandamus* against public officials. But the opinion did not purport to deal with an order sought to compel ministerial action. The problem in Larson was a threatened alleged illegal action. An executive official had been authorized by the Congress to dispose of certain Government property. The Court described the two familiar types of cases in which threatened illegal action can be enjoined, (1) action outside the official's authority and (2) action under an unconstitutional delegation of authority. Then the Court carefully explained the rule that, even though a Government

v. Board of Trustees, Teachers' Retirement, etc., La.App.1947, 29 So.2d 489; Board of Sup'rs of Elections v. County Com'rs, 1952, 200 Md. 114, 88 A.2d 462; National Bank of Detroit v. State Land Office Board, 1942, 300 Mich. 240, 1 N. W.2d 525; State ex rel. Folkers v. Welsch, 1939, 235 Mo.App. 15, 124 S.W.2d 636; State ex rel. Wolff v. Geurkind, 1941, 111 Mont. 417, 109 P.2d 1094, 133 A.L.R. 304; State ex rel. Smith v. Nebraska Liquor Control Comm., 1950, 152 Neb. 676, 42 N.W.2d 297; State ex rel. Teeter v. Eighth Judicial District Court, 1947, 64 Nev. 256, 180 P.2d 590; Garrou v. Teaneck Tryon Co., 1953, 11 N.J. 294, 94 A.2d 332; City of New York v. Schoeck, 1945, 294 N.Y. 559, 63 N.E.2d 104; Hamlet Hospital & Training School v. Joint Committee, 1952, 234 N.C. 673, 68 S.E.2d 862; Board of County Com'rs of Osage County v. Prentice, 1938, 183 Okl. 542, 83 P.2d 557; Seufert v. Stadelman, 1946, 178 Or. 646, 167 P.2d 936; Hotel Casey Co. v. Ross, 1942, 343 Pa. 573, 23 A.2d 737; Greenwood Volunteer Fire Co. v. Dearden, 1940, 64 R.I. 368, 12 A.2d 408; Easler v. Maybank, 1939, 191 S.C. 511, 5 S.E. 2d 288; State ex rel. Motlow v. Clark, 1938, 173 Tenn. 81, 114 S.W.2d 800;

Coleman v. Bench, 1938, 96 Utah 143, 84 P.2d 412; Gaffney v. Commissioners of Jail Delivery, 1942, 112 Vt. 438, 27 A.2d 114; State ex rel. Ward v. Raleigh County Court, W.Va.1953, 76 S.E.2d 579.

36. Minnesota v. United States, 1939, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235; Louisiana v. Garfield, 1908, 211 U.S. 70, 29 S.Ct. 31, 53 L.Ed. 92; The Siren, 1869, 7 Wall. 152, 74 U.S. 152, 19 L.Ed. 129.

37. Young v. Anderson, 1947, 81 U.S.App. D.C. 379, 160 F.2d 225, certiorari denied, 1947, 331 U.S. 824, 67 S.Ct. 1316, 91 L. Ed. 1840; Seiden v. Larson, 1951, 88 U.S.App.D.C. 258, 188 F.2d 661, certiorari denied, 1951, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373.

38. See American Dredging Co. v. Cochrane, supra, and, as to contracts to purchase, International Trading Corporation v. Edison, 1939, 71 App.D.C. 210, 109 F. 2d 825, certiorari denied, 1940, 310 U.S. 652, 60 S.Ct. 1099, 84 L.Ed. 1417.

39. 1913, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191.

40. 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

agent threatens to commit a tort while acting within the scope of his delegated power, the tort cannot be enjoined without consent of the sovereign principal, since it is also the act of the sovereign. The confusion arises principally because of a footnote to the opinion [41] which reads as follows:

"Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. North Carolina v. Temple, 134 U.S. 22 [10 S.Ct. 509, 33 L.Ed. 849] (1890)."

It is suggested that this footnote means that a suit will fail if the relief requested would involve the disposition of Government property. But the footnote does not make that statement. Rather its meaning is that a suit must fail if it would require the sovereign to dispose of its property—sovereign action, in other words. That meaning is borne out by the one citation made. The one case cited was North Carolina v. Temple,[42] and the Supreme Court, in the course of that opinion, said of the case: "In other words, it is a suit, in the nature of a bill for a specific performance of a contract, brought to compel the State of North Carolina to raise a tax for the payment of the arrears of interest due on the state bonds held by the plaintiff and others." The State and the State Auditor were named parties defendant.

Holding in two brief sentences that that suit was "virtually" against the State itself, the Court cited four cases. We examine them. State of Louisiana ex rel. Elliott v. Jumel [43] was a suit which sought to compel officials of the State of Louisiana to carry out general duties as executive officials of the State. "The remedy sought," said the Court, "in order to be complete, would require the court to assume all the executive authority of the State, so far as it related to the enforcement of this law * * *." [44] Cunningham v. Macon, etc. R. R. Co.[45] contained an elaborate discussion of the principles upon which a state is held not to be an indispensable party (although some interest of the state may be more or less involved), dividing the cases into three classes. The third class consisted of those cases in which the duty to be performed was merely ministerial and could be compelled by *mandamus*. The Court cited with approval Marbury v. Madison and other similar cases. Hagood v. Southern [46] involved several suits which, the Supreme Court said, "are accurately described as bills for the specific performance of a contract between the complainants and the State of South Carolina, who are the only parties to it." [47] The Court observed: "If this case is not within the class of those forbidden by the constitutional guaranty to the States of immunity from suits in federal tribunals, it is difficult to conceive the frame of one which would be." [48] Ex parte Ayers [49] was a petition for a writ of *habeas corpus*. The petitioners had been sentenced for contempt for violation of an order of a court. The question was whether the court had power to issue the order which had been violat-

41. Supra, 337 U.S. at 691, 69 S.Ct. at 1462, note 11.

42. 1890, 134 U.S. 22, 10 S.Ct. 509, 33 L. Ed. 849.

43. 1883, 107 U.S. 711, 2 S.Ct. 128, 27 L. Ed. 448.

44. Id., 107 U.S. at 727, 2 S.Ct. at 141, 27 L.Ed. at 454.

45. 1883, 109 U.S. 446, 3 S.Ct. 292, 609, 27 L.Ed. 992.

46. 1886, 117 U.S. 52, 6 S.Ct. 608, 29 L. Ed. 805.

47. Id., 117 U.S. at 67, 6 S.Ct. at 615, 29 L.Ed. at 810.

48. Id., 117 U.S. at 69, 6 S.Ct. at 616, 29 L.Ed. at 810.

49. 1887, 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216.

ed. That issue depended upon whether the suit was against the state. After an elaborate discussion the Court pointed out that "The acts sought to be restrained are the bringing of suits by the State of Virginia in its own name and for its own use." [50] Thus neither North Carolina v. Temple nor any of the cases cited in it stated or held that a suit would fail merely because it involved disposition of sovereign property.

In American Dredging Co. v. Cochrane, supra, we said that a non-discretionary act required of an official falls within the exception stated in the Larson case, supra, relating to acts without authority. If Larson is to be deemed a complete statement of all the rules relating to court orders addressed to executive officials, the view indicated in American Dredging must be correct. Because, if Larson is the summation of all the law on the whole subject, and if court orders compelling performance of merely ministerial acts are not within one of the exceptions stated in Larson, the Supreme Court must be deemed to have overruled the entire line of cases on that subject, stemming from Marbury v. Madison. We think it inconceivable that the Court would take such a step without mentioning the rule of those cases or the cases themselves, and particularly that it would take such sweeping action in a footnote to an opinion which did not involve the point.

Differing somewhat from the suggestion we made in the American Dredging Co. case, it seems to us now that the Court in the Larson case, consistently with its action in other cases dealing with sales, did not regard the rule as to ministerial duty relevant to the problem before it. In the past, although the same Justices who sat in one type of case,—i. e., ministerial duty,—also sat in the other type,—i. e., sales of property,— they apparently did not consider that the rule in one impinged upon the rule in the other. For example, Mr. Justice Holmes, who wrote the opinion in United States ex rel. Goldberg v. Daniels, supra, also sat in Ballinger v. United States ex rel. Frost,[51] Lane v. Hoglund,[52] and Work v. United States ex rel. McAlester, etc. Co.,[53] in all three of which the Court unanimously affirmed the issuance of *mandamus* to compel completion of patents to land; and he also wrote the opinion in Santa Fe Pac. R. R. Co. v. Fall,[54] in which the Court reversed a denial of an injunction sought to prevent cancellation of selections of land for patents.

### VIII

The sovereign power over Government property was vested by the people in the Congress.[55] As a matter of fact the property problem in the great Northwest was one of the impelling reasons for a Federal Government.[56] Congress can exercise that power itself, or it can confer on some agency or officer a measure of sovereign authority over certain property, for example, power to sell. If, on the other hand, Congress itself exercises the full of the sovereign power in respect to property, it may and usually does leave mechanical, ministerial or administrative details to an individual official. In such a case the act of Congress is the complete act needed by the sovereign; the subsequent ministerial acts do not involve sovereign power. If Congress itself were to transfer title to a parcel of public land to a named individual, the officer preparing and executing the documents pursuant to congressional direction would not be exercising sovereign power.

---

50. Id., 123 U.S. at 497, 8 S.Ct. at 178, 31 L.Ed. at 227.

51. 1910, 216 U.S. 240, 30 S.Ct. 338, 54 L. Ed. 464.

52. 1917, 244 U.S. 174, 37 S.Ct. 558, 61 L. Ed. 1066.

53. 1923, 262 U.S. 200, 43 S.Ct. 580, 67 L.Ed. 949.

54. 1922, 259 U.S. 197, 42 S.Ct. 466, 66 L. Ed. 896.

55. U.S.Const. Art. IV, § 3.

56. 1 Curtis, Constitutional History of the United States c. XIV (1889).

## IX

Appellee Secretaries cite Mine Safety Appliances Co. v. Forrestal.[57] The Supreme Court, in pointing out the basis upon which it held *mandamus* not available in that case, said: "Certainly the action which the Secretary proposed to take is not a violation of any express command of Congress. Cf. Rolston v. Missouri Fund Comm'rs, 120 U.S. 390, 411 [7 S.Ct. 599, 30 L.Ed. 721]; Houston v. Ormes, 252 U.S. 469 [40 S.Ct. 369, 64 L.Ed. 667]; Smith v. Jackson, 246 U.S. 388 [38 S.Ct. 353, 62 L.Ed. 788]."[58] In Houston v. Ormes the Court had affirmed a decree which established a lien upon funds in the Treasury. In Smith v. Jackson it had affirmed a decree which directed payment of a judge's salary without certain deductions. In Rolston v. Missouri Fund Comm'rs it had affirmed a decree which compelled state officers to assign certain liens on property mortgaged in favor of the state. Each of those three cases involved property or money. In each the Court acted upon the declared rule that *mandamus* will issue to compel performance of a ministerial duty imposed upon an officer by the legislature. Clearly the statement above quoted from the Mine Safety case was a reaffirmation of that rule.

Appellee Secretaries cite Haskins Bros. & Co. v. Morgenthau,[59] but in that case Judge Groner pointed out, "Nor is it a suit for the purpose of requiring an officer to perform a plain ministerial duty, for likewise in such a case a court may compel him to perform the duty."[60] They cite Stitzel-Weller Distillery v. Wickard,[61] but one of the main points at issue in that case was whether Congress had directed distribution of the moneys to plaintiffs, and this court held that it had not so directed; thus the implicit crux of the decision was the existence *vel non* of a congressional directive. They cite Osage Tribe of Indians v. Ickes,[62] but the basis of that suit was the alleged unconstitutionality of a statute which directed the disposition of the funds, and the court held that the United States as statutory trustee of the disputed money was a necessary party. The Secretaries cite Morrison v. Work,[63] but the Supreme Court there specifically noted that it did not reach the question "whether the duty of the Secretary of the Interior is merely ministerial".[64] Young v. Anderson,[65] cited by appellee Secretaries, was a suit to set aside a title in the United States, reversing prior sales and condemnations; the ministerial act problem was not remotely involved. Of the same nature was Seiden v. Larson,[66] also cited by appellees.

We think it clear from the cases that the *critical factor in a suit to compel action by an executive officer of the Government is whether the action sought to be compelled is ministerial or involves judgment and discretion.* The problem assumes greater and greater importance as the administrative process grows, because more and more executive and administrative officers are dealing more and more with rights of individual citizens.

## X

Appellee Secretaries say that the actions here sought to be compelled by *mandamus* involve discretionary matters.

57. 1945, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140.

58. Id., 326 U.S. at 374, 66 S.Ct. at 221.

59. 1936, 66 App.D.C. 178, 182, 85 F.2d 677, 681, certiorari denied, 1936, 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433.

60. Id., 66 App.D.C. at 185, 85 F.2d at 684.

61. 1941, 73 App.D.C. 220, 118 F.2d 19.

62. 1943, 77 U.S.App.D.C. 114, 133 F.2d 47, affirming on the opinion at 45 F. Supp. 179 (D.C.D.C.1942), certiorari denied, 1943, 319 U.S. 750, 63 S.Ct. 1158, 87 L.Ed. 1704.

63. 1925, 266 U.S. 481, 45 S.Ct. 149, 69 L. Ed. 394.

64. Id., 266 U.S. at 489, 45 S.Ct. at 153.

65. 1947, 81 U.S.App.D.C. 379, 160 F.2d 225, certiorari denied, 1947, 331 U.S. 824, 67 S.Ct. 1316, 91 L.Ed. 1840.

66. 1951, 88 U.S.App.D.C. 258, 188 F.2d 661, certiorari denied, 1951, 341 U.S. 950, 71 S.Ct. 1017, 95 L.Ed. 1373.

In this part of their argument they apparently concede that if the duty to be performed is ministerial *mandamus* can issue to compel it; for they say that relief can be thus granted only when the duty is ministerial. They describe the discretionary matters as being the fact that the land here involved has long been administered by the Secretary of Agriculture as an integral part of the national forests. They say that the moneys have never been put in the "Oregon and California land-grant fund" but were put in another fund. Thus they say that the status of the land and the money "is a much mooted question". The difficulty with that contention is that those matters are "much mooted" only within the executive branch of government in disregard of (1) a valid finding and decree of a federal court and (2) a specific act of the Congress. That these 472,000 acres were within the national forests was the precise argument made to the District Court of Oregon in an effort to persuade that court that these were not Oregon and California railroad lands revested in the United States by the 1916 Act of Congress. The moneys now involved are the balances of the funds described in the 1916 Act, derived from the sale of timber described in the same act, on the lands which were the subject of that same 1916 Act. Executive officers cannot under such circumstances create an area of doubt and dispute which will be outside the established power of the judiciary to compel obedience to a clear mandate of the Congress. They cannot by bootstraps manufactured by them lift themselves out of the jurisdiction of the courts.

## XI

█ Our dissenting judge is of the view that Congress did not unmistakably authorize the determination in the civil action in the Oregon District Court of the question of what lands had been granted. He says that the action Congress authorized was to determine the moneys received by the railroad on account of the granted lands. But it seems clear to us that to determine the moneys received by the railroad "on account of any of said granted lands," the court had to determine what the granted lands were. The court so construed its duty, and we think it was correct in doing so. The United States did not appeal from that treatment.

Our dissenting judge places major emphasis upon an extract from Section 10 of the 1916 Act, which dealt with the disposition of the moneys derived from the revested lands. After directing that all these moneys be placed in the Oregon and California land-grant fund, the act provided that that fund "be disposed of in the following manner". Then followed a formula. The Secretary was to "ascertain * * * the exact number" of acres of granted land and multiply that figure by $2.50. From that sum he was to make certain deductions and then, year by year, pay the balance to the railroad and certain lienholders until they had been fully paid their due. Thereafter the section provided that the balances should be paid to the counties, etc. In the first place we note that Congress did not authorize the Secretary to *determine* anything; it directed him to "ascertain". "Ascertain" does not mean decide; it means learn. He was not to ascertain what acres or parcels had been granted but merely the *number of* acres granted. This was apparently a simple arithmetical computation, because a certain number of acres had been granted for each mile of track built. The complication of determining what parcels and acres had been granted arose when revesting was declared and it became necessary to determine what moneys the railroad had received on account of the granted lands. That task Congress left to the court in the suit it directed the Attorney General to bring. The number of acres granted was clear enough; what particular land comprised those acres was a different and difficult problem. In the next place it seems to us to be impossible to believe that Congress meant to authorize a suit for the determination of the moneys which had been received by the railroad on account of the granted

lands, and then in the same act authorize the Secretary to determine what lands had been granted. Congress very carefully did not do that. Its words were precise, and we think it meant what it said.

## XII

▪ As we pointed out in our examination of the statutes involved in the case at bar, Congress gave the Secretary of the Interior authority in certain respects in regard to the lands revested from the Oregon and California Railroad and in respect to the timber on those lands. In the exercise of those duties he was required to use his discretion and judgment. Those actions could not be controlled by the courts. But when those duties were all completed, and at the end of the year a balance remained in the Oregon and California land-grant fund in the Treasury, the Secretary had no discretion as to his action. He was specifically and unequivocally directed by the Congress to cause the distribution of that balance according to the terms of the statute. That function of the Secretary fell within the line of cases beginning with Marbury v. Madison, which we have cited. The courts can and should require him to comply with the congressional mandate.

## XIII

 With respect to the other question presented to us, which concerns the Secretary of Agriculture, this court has held, without equivocation, that Government officials are bound to comply with the valid decisions of the courts.[67] In a valid final decision of a federal court in a suit to which the United States was a party by its own action, the lands here involved were held to be lands of the Oregon and California Railroad Company which were revested by act of Congress and which, as revested lands, came within the statutes we have discussed. The Secretary of Agriculture, like every other Government official, is required to abide by the terms of that court decision.

 We conclude that the case at bar is not, within the meaning and principle of the authorities, an action against the United States Government and that the United States is not an indispensable party.

## XIV

The judgment of the District Court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

EDGERTON, Circuit Judge (dissenting).

The court's conclusion rests on the premise, among others, that in the 1916 Act Congress unmistakably authorized the District Court for Oregon to decide whether the 472,000 acres of government land here involved had been granted to the railroad. I think this premise erroneous.

The 1916 Act revested in the United States so much of the granted lands as had not been sold by the railroad. In § 7, the Act expressly authorized the Attorney General to "institute and prosecute * * * suits * * * against the Oregon and California Railroad Company * * * to have determined *the amount of moneys which have been received by the said railroad company* * * * on account of * * * granted lands * * * *and which should be charged against it* as a part of the 'full value' secured to the grantees under said granting Acts as heretofore interpreted by the Supreme Court." (Emphasis added.) 39 Stat. 221. The Act did not, expressly or by any implication that I can see, authorize a court to determine in such a suit what lands had been granted.

There is some implication to the contrary, for § 10 of the Act, which said

67. Land v. Dollar, 1951, 88 U.S.App.D.C. 311, 190 F.2d 366; Land v. Dollar, 1951, 89 U.S.App.D.C. 38, 190 F.2d 623. (The orders in these cases were stayed and eventually dismissed by the Supreme Court.) See also International Union, etc., v. United States, 1949, 85 U.S.App. D.C. 149, 177 F.2d 29, certiorari denied, 1949, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535.

nothing about a court or a suit or the Attorney General, authorized *the Secretary of the Interior* to ascertain how much land had been granted. 39 Stat. 222.

This court says that "to determine the moneys received by the railroad 'on account of any of said granted lands,' the court had to determine what the granted lands were." This seems to me both debatable and immaterial. It is immaterial because it applies only to lands which the railroad had sold and which, therefore, were not revested in the United States by the 1916 Act. As the court points out elsewhere in its opinion, we are concerned with lands which the railroad had *not* sold and which *were* revested in the United States by the 1916 Act.

Though the court says the words of Congress "were precise, and we think it meant what it said", the court points to no precise words by which Congress said that the District Court for Oregon might decide what lands were granted. I do not suggest that the question whether Congress meant that is not debatable. But the very fact that it is debatable means that the status of the lands and funds now in suit is not so clear as to make the duties of the Secretaries merely ministerial. I do not reach other questions.

On Petition for Rehearing.

PER CURIAM.

 The court has before it a petition for rehearing and several motions.

1. In so far as the petition for rehearing requested rehearing *in banc*, it was denied by the court on June 21, 1954. In the course of their petition for rehearing appellees urged that the court's judgment directed an action which is premature in the present status of the case. In Section XIV of the opinion promulgated April 30, 1954, this court directed the entry of a decree and specified the terms of the decree.[1] This was an inadvertence arising from references in the record and briefs to summary judgment in the District Court. As a matter of fact the District Court granted a motion to dismiss the complaint. The defendant Secretaries had not pleaded, other than to move to dismiss, and a motion for summary judgment was neither made nor considered. Section XIV of the opinion of April 30, 1954, will be stricken and the following inserted in lieu thereof:

XIV

The judgment of the District Court will be reversed and the case remanded for further proceedings not inconsistent with this opinion.

Of course, if the allegations of the complaint are substantially established as pleaded, a decree of the District Court not inconsistent with the opinion of this court would contain substantially the matter described in our original Section XIV. The petition for rehearing will be denied.

 2. Appellees move that the judgment heretofore entered by this court be vacated, the opinion promulgated April 30, 1954, be withdrawn, and the

1. Section XIV of the opinion promulgated April 30, 1954, read as follows:

"The judgment of the District Court will be reversed and the case remanded with instructions to enter a decree in accordance with the terms of this opinion. The decree will enjoin the Secretary of Agriculture from interfering with compliance by any other Government official with the terms of the Acts of 1916 and 1937, and specifically from interfering with the distribution by the Secretary of the Interior and the Treasurer of the United States of the moneys which remain as balances in the account in the

Treasury which by the terms of the statute was a special account of which the proper title was "The Oregon and California land-grant fund", and from interfering with the treatment of the 472,000 acres of land here involved as land revested from the railroad by the 1916 Act of Congress; and will direct the Secretary of the Interior to issue authorization to the Treasurer of the United States to distribute the balances in the aforesaid account to the entities named in the pertinent statutes and in the proportions therein specified."

case be remanded to the District Court as moot because of the enactment on June 24, 1954, of Public Law 426, 68 Stat. 270, 43 U.S.C.A. §§ 1181f–1181j. The gist of the controversy is that the defendant Secretaries have failed and refused to comply with an Act of Congress of June 9, 1916, 39 Stat. 218, known as the Chamberlain-Ferris Act, and a further Act of 1937, 50 Stat. 874, 43 U.S.C. A. § 1181a et seq., which was based upon and further implemented the Act of 1916. The judgment of this court was that it was and is the duty of the Secretaries to comply with the 1937 Act, and that they could and should be required to do so. Public Law 426, approved June 24, 1954, provides that the revenues derived from these lands and placed in special deposit "shall be disposed of in accordance with the provisions of title II of the Act approved August 28, 1937 (50 Stat. 874) as hereby amended". It is not alleged, and it does not appear, that the amendments to the 1937 Act made by Public Law 426 changed the distribution directed by the 1937 Act. The amendments went principally to the future administration of the revested lands, a matter which was not involved in this litigation or considered in the opinion of this court, as the opinion itself carefully noted. This view is supported by the statement made on behalf of the seventeen Oregon counties to the Senate Committee considering the bill which became Public Law 426.[2] Therefore it appears that, in so far as it is pertinent to the present controversy, Public Law 426 merely directs the Secretaries to comply with the 1937 Act, which is precisely what the court directed them to do. No statement is made that the Secretaries have complied by distributing the funds in accordance with the distribution directed in the 1937 Act. It thus clearly appears that the judgment of the court has not been rendered moot. The motion to dismiss as moot will be denied. Likewise the prayers, contained in the same motion, to vacate the judgment and to withdraw the opinion will be denied.

3. Seventeen counties in Oregon move for leave to intervene for the purpose of filing a motion to dismiss the appeal as moot. The complaint in this case was brought by Clackamas County, Oregon, as one of eighteen counties which, it contended, were entitled to the funds derived from the revested lands. In the complaint the plaintiff said: "Clackamas County brings this suit on its own behalf, and in behalf of any other of the 18 Oregon counties interested who may see fit to come in and become parties, or who may be brought in by order of this Honorable Court under its powers in the premises." The names of the other seventeen counties were listed. So far as the record before us shows, none of the other seventeen counties sought to become a party and none was brought in by order of the court. Nevertheless it is clear as a practical matter that, if, pursuant to the opinion of this court of April 30, 1954, it should eventuate that the District Court should compel the Secretaries to distribute the funds pursuant to statute, each of the seventeen counties will receive its share and will thus be a beneficiary of the litigation. These counties say that they expect the Secretaries to comply with Public Law 426 and that thus they will receive their distributive share of the funds quite apart from the litigation.

■ A petition to intervene is addressed to the sound discretion of the court, and particularly is this so where the petition comes so late in the litigation, after judgment has been entered by the appellate court. Under all these circumstances the petition to intervene will be denied. In this connection we call attention to what we have hereinabove said in connection with the motion of the Secretaries to dismiss the litigation as moot.

4. Appellant moves for leave to file the printed hearings which are part of

2. Statement of Frank S. Sever, Hearing before Committee on Interior and Insular Affairs on S. 2225, 83d Cong., 2d Sess. 38 (1954).

the legislative history of Public Law 426, approved June 24, 1954. This motion will be granted in view of the motions of the seventeen counties and of the appellee Secretaries, which are premised upon Public Law 426.

5. Appellant moves to file a supplemental memorandum in opposition to the Secretaries' motion to vacate the judgment and dismiss as moot. This motion will be granted.

6. Appellant moves for leave to file a telegram, which telegram appears to have been directed from the Commissioners of Clackamas County, Oregon, and its counsel in Oregon to local counsel. It is in the nature of a brief in opposition to the motion of the appellee Secretaries for amendment of the opinion. The motion will be granted and the telegram of counsel filed as a memorandum in argument upon that motion of the appellee Secretaries.

EDGERTON, Circuit Judge, took no part in these rulings.